UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FLYERS RIGHTS EDUCATION FUND, INC., *et al.*, ) ) ) ) Plaintiffs, ) ) v. ) ) FEDERAL AVIATION ADMINISTRATION, ) ) Defendant. ) ) ) | Civil Action No. 19-cv- 3749 (CKK) |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

This action was brought by Plaintiff Flyers Rights Education Fund, Inc. ("FlyersRights") to compel Defendant Federal Aviation Administration to make available, under the Freedom of Information Act, records submitted to the FAA that would show the basis on which The Boeing Company seeks to have re-certified and put back into service in commercial aviation, its 737 MAX aircraft. Two of those aircraft crashed within a period of five months, resulting in the deaths of 346 passengers and crew members.  The re-certification process is now in its final stages,

Pursuant to this Court's Orders, the FAA processed and reviewed,  over the course of six months, more than 8,000 pages of material.  Ultimately the FAA produced to Plaintiff a number of transmittal and cover letters, but withheld essentially all of the substantive information in the responsive documents based on Exemption 4 or Exemption 6.  The *Vaughn* Index filed by the FAA (Doc. No. 19-1) lists  the 108 documents reviewed and processed by the FAA. It indicates that the agency withheld virtually every document reviewed, in whole

or in substantial part, based on Exemption 4. (Names of Boeing employees and associated personal information were  also withheld under  Exemption 6, but Plaintiff is not challenging the withholding of that information).

A  substantial part of the information withheld under Exemption 4 consists, not of technical drawings or design details of the aircraft, or its systems and components or software, but of  information relating to the *processes* by which the FAA would determine whether Boeing's  proposed  fixes  work  and  are  satisfactory.    Specifically,  these  categories  of information  include certification plans; testing methods, plans and conditions; means of compliance with regulatory requirements; flight test plans and criteria; flight test results; safety analyses; and FAA and government agency comments on safety analyses ("Disputed Information Categories").  Plaintiff challenges the withholding of these specific categories of information under Exemption 4.

Boeing's position, advanced by the FAA, is that all of the information withheld under Exemption 4 is "confidential' because it meets the two criteria set out in *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019): that it  (i) is customarily and actually treated as private by Boeing and (ii) was provided to  the FAA "under an assurance of privacy." *Food Marketing Inst.*, 139 S. Ct. at 2366. Boeing does not  identify any specific assurance of privacy given  by  the  FAA,  relying  instead  on  an  "implied"  assurance  based  on  "context"  and "historical treatment."

But in this case, the past ("historical treatment") is not prologue. Not only did the FAA not extend any assurance  of privacy, the agency has repeatedly represented to the public that its re-certification process for the 737 MAX would be completely transparent—a posture with which Boeing publicly and repeatedly agreed. In these circumstances, as to the categories of

absolutely central and essential to understanding and evaluating the re-certification decision, Boeing could not possibly have rationally believed or expected that such information would be kept private by the agency. In addition, specifically as to information consisting of comments by the FAA itself,, and withheld by FAA, Exemption 4 is inapplicable altogether as such information was not "obtained from a person".

For those reasons, as to the Disputed Information Categories, there is no genuine issue of material fact and, as to the legal issue of whether exemption 4 was properly invoked to shield those documents and portions of documents from disclosure, Plaintiff is entitled to judgment as a matter of law.  The Exemption was not properly invoked as to the withheld information   in the Disputed Information Categories. The Court should order that this information be produced.

## FACTUAL BACKGROUND

### A.   Status of 737 MAX Aircraft

On October 29, 2018, a 737 MAX operated by Lion Air on Flight JT610 crashed after taking off from Jakarta, Indonesia, killing all 189 passengers and crew members on board. On March 10, 2019, a 737 MAX operated by Ethiopian Airlines on Flight ET302 similarly crashed minutes after takeoff from Addis Ababa, Ethiopia, killing all 157 passengers and crewmembers on board.

On March 13, 2109, the FAA issued an emergency order prohibiting operation of the 737 MAX aircraft by U.S. certificated operators.  *Operators of Boeing Company Model 737-8 and Boeing Company Model 737-9 Airplanes: Emergency Order of Prohibition*, 84 Fed. Reg. 9705 (March 18, 2019).   The agency noted that information developed at that point "indicates some

similarities between the ET302 and JT610 accidents that warrant further investigation of the possibility of a shared cause…." *Id.*

The 737 MAX had engines that did not fit under the wings of the older version of the airplane. Boeing pigeonholed the new engines by taking certain steps to mount them forward of the wings that generated greater lift for the aircraft, creating a tendency for the nose to pitch up. R. Vartabedian, *How a 50 Year Old Design Came Back to Haunt Boeing With Its Troubled 737 MAX Jet*, Los Angeles Times March 15, 2019 https://www.latimes.com/local/california/la-fi-boeing-max-design-20190315-story.html. To make the aircraft feel similar to older models, Boeing installed a "Maneuvering Characteristics Augmentation System" ("MCAS"), that was supposed to compensate by pushing the nose of the aircraft down. D. Gates, *Flawed analysis, failed oversight: How Boeing, FAA Certified the Suspect 737 MAX Flight Control System*, Seattle Times, March 17, 2019, https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/ (last visited Dec. 12, 2019).

As a result of fundamental design flaws in the MCAS, and Boeing's failure properly to inform pilots about and train them on its operation, the MCAS could pull down the nose of the airplane down sharply, suddenly and repeatedly, with pilots unaware of why that is happening or how to override it. *Id.*

A Safety Recommendation Report issued by the National Transportation Safety Board in September 2019, citing the preliminary investigations of the fatal crashes by air transportation authorities in Indonesia and Ethiopia, pointed to the pilots' inability to override the automatic operations of MCAS. National Transportation Safety Board, *Safety*

*Recommendation Report* at 2-3 (Sept. 19, 2019), https://www.ntsb.gov/investigations/AccidentReports/Reports/ASR1901.pdf (last visited Oct. 26, 2020). NTSB found that "the assumptions that Boeing used in its functional hazard assessment of uncommanded MCAS function for the 737 MAX did not adequately consider" factors affecting pilot response. *Id.* at 8. NTSB recommended to the FAA, among other things, that it require Boeing to "incorporate design enhancement. . . pilot procedures, and/or training requirements, where needed, to minimize the potential for and safety impact of pilot actions that are inconsistent with manufacturer assumptions." *Id.*

Throughout 2019, after reports identified flaws in the aircraft's flight control system as the likely cause of the crashes, Boeing submitted proposed solutions and fixes to the FAA, seeking recertification of the airworthiness of the aircraft—the final legal condition for ungrounding of the aircraft. FAA, *FAA Updates on Boeing 737 MAX* https://www.faa.gov/news/updates/?newsid=93206 (last visited Oct. 22, 2020); FAA *Vaughn Index*, Doc. No. 19-1.

In June 2020, the FAA and Boeing conducted a series of certification flights to evaluate Boeing's proposed changes to the automated flight control system on the 737 MAX. Those tests were completed on July 1. No specific results were disclosed. *FAA Updates on Boeing 737 MAX*, https://search.yahoo.com/search?fr=mcafee&type=E211US739G0&p=faa+max+737+updates (last visited Oct. 22, 2020). On August 3, 2020, the FAA released a summary of its review of the aircraft's fitness to return to service with the changes proposed by Boeing. FAA, *Preliminary Summary of the AFAA's Review of the Boeing 737 Max* (Aug. 3, 2020) ("*FAA Preliminary Summary*").

A few days later, FAA issued a proposed Airworthiness Directive requiring certain changes to be made to the design of 737 MAX as a condition of returning the aircraft to service. FAA, *Airworthiness Directives: The Boeing Company Airplanes, Notice of Proposed Rulemaking*, 85 Fed. Reg.  47698 (Aug. 6, 2020). The main required changes would be installation of updated flight control software; installing updated display processing software to generate an angle-of-attack (AOA) disagree alert; revising certain Aircraft flight Manual flight crew operating procedures; and (4) changing the routing of horizontal stabilizer trim wires.  *Id*. at 47699.  In addition, the FAA proposes to require airlines to conduct certain system tests and perform an operational readiness flight prior to returning each airplane to service.  *Id*. at 47699-47700. The deadline for comments was September 21, 2020.  The proposal generated more than 300 comments, mostly unfavorable. FAA Docket FAA-2020-0686         https://www.regulations.gov/searchResults?rpp=25&po=0&s=FAA-2020-0686&fp=true&ns=true   (last visited Oct. 28, 2020).

In September 2020, an extensive report on the causes of the failures of the 737 MAX aircraft was released by the Majority Staff of the U.S. House Committee on Transportation and Infrastructure.  *Final Committee Report, The Design Development and Certification of the Boeing 737 MAX* (Sept. 2020). The report set out five "central themes that affected the design development and certification of the 7347 MAX and FAA's oversight of Boeing," including a "Culture of Concealment" leading Boeing to withhold "crucial information from the FAA, its customers and 737 MAX pilots."  *Id*. at 12-13.

On October 1, 2020, the chairs of the U.S. House Committee on Transportation and Infrastructure and its Subcommittee on Aviation wrote to FAA Administrator Steve Dickson, urging the FAA "in the strongest possible terms to publicly release all documents related to

design revisions or evaluations related to the aircraft's safe return to service." Letter from Reps. Peter A. DeFazio and Rick Larsen to Steve Dickson, Oct. 1, 2020 (attached to Statement of Material Undisputed Facts as Exhibit 1). The letter stated that the FAA "should fully reveal the data any determination to unground the MAX has been based upon. This is a critical point. The public needs to see this data and that sort of transparency can only help to enhance aviation safety." *Id.*

On October 6, the FAA posted a draft Flight Standardization Board report on proposed pilot training for the 737 MAX. FAA, *Flight Standardization Board Reports*, https://www.faa.gov/aircraft/draft_docs/media/afx/FSBR_B737_Rev_17_Draft.pdf (last visited Oct. 22, 2020).

According to the FAA, there are four steps remaining in order for the 737 MAX to be returned to service: (1) review of Boeing's final design documentation and Technical Advisory Board Report; (2) Continued Airworthiness Notification to the International Community; (3) publication of the final Airworthiness Directive ("AD"); and (4) rescission of the grounding order, which will mark "the official ungrounding of aircraft, pending completion by operators of the work specified in the AD, along with any required training." *FAA Updates on Boeing 737 MAX, supra*.

**B.   Procedural History of this Case**

On October 31, 2019, FlyersRights submitted a FOIA request to the FAA seeking records showing all of the fixes and changes proposed by Boeing to the FAA to be considered by the FAA in determining when the 737 MAX aircraft would be re-certified to fly and ungrounded. (Doc. No. 1-1). On December 16, 2019, Plaintiff filed a complaint to compel the FAA to grant expedited treatment and to produce the requested records on an expedited

basis.  (Doc. No. 1).   On December 23, 2019, Plaintiff filed a motion for preliminary injunction to compel the requested expedited processing. (Doc. No. 3).

The FAA performed a search for responsive records and reported that it had identified 49,000 pages of responsive material. The parties consulted and agreed to narrow the FOIA request to encompass only those documents on which the FAA would actually rely in making any decision about the return to service of the 737 MAX.  FAA reported that narrowing the request in this way reduced the volume of documents to 86 records including 9,443 pages. (Doc. No. 9). Pursuant to the Court's Order,  the FAA provided Plaintiff with a list of 95 documents and Plaintiff provided a prioritization of those documents. (Doc. No. 10, Exhibits A& B).  On March 5, 2020, Plaintiff filed a motion to withdraw its motion for preliminary injunction. (Doc. No. 14).

Pursuant to a further Order of the Court,  Boeing identified 76 documents containing information that it contended should not be released based on Exemption 4. (Doc. 15-1 ¶¶6-11). The FAA released four documents in full and 16 documents with names of Boeing employees redacted under Exemption 6.  The parties agreed that the remaining documents would be reviewed at a rate of 1,000 pages per month.  (Doc. No. 15). The FAA then produced the remaining documents, all of which were redacted almost in their entirety except for cover memos and transmittal letters, on a monthly basis from April through September 2020. The FAA completed its processing and production of records on September 21, 2020.

On October 9, 2020, pursuant to a further Court Order, the FAA filed a *Vaughn* Index and a supporting declaration of a Boeing paralegal.  (Doc. No. 19).

### C. *Vaughn* Index and Claimed Basis for Exemption 4

The FAA's *Vaughn* Index (Doc. No. 19-1) lists 108 documents withheld in full or produced with redactions, based on Exemptions 4 and/or 6.  They documents are numbered based on the priority order proposed by Plaintiff.

Among the categories of information withheld based on Exemption 4 are categories relating directly to the process followed by the FAA in determining the conditions it would impose for re-certifying the aircraft.  These categories are set forth in the table below, with an indication of the documents in which those categories appear, according to the *Vaughn* Index:

| Category of Information Withheld Under Exemption 4 | Documents In Which Category Appears (Doc. Number on *Vaughn* Index) |
|---|---|
| Certification plans | 3, 4, 5,6, 11, 13, 57, 70. 100 |
| Testing methods, plans & conditions | 1, 5, 6, 46, 48, 60, 75, 98 |
| Means of compliance | 3, 4, 5, 6, 11, 12, 14, 17, 19, 21, 23, 24, 37 42, 49, 60, 64, 68, 71, 73, 75, 81, 91, 96. 97, 104, 107 |
| Flight test plans & criteria | 2, 50, 51, 55, 76, 77 |
| Flight test results | 2, 76, 77 |
| Safety Analyses | 3 , 9, 18, 23, 26, 28, 37, 43, 44, 63, 65 |
| FAA and foreign government agency comments | 32, 41, 45, 50, 83 |

These categories of information are referred to in this brief as the "Disputed Information Categories."

Together with the *Vaughn* Index, the FAA submitted a declaration of a Boeing paralegal setting out the basis on which Boeing invoked Exemption 4 as to the documents withheld under that exemption. Declaration of Jeffrey Allen, Doc. No. 19-2 ("Allen Decl."). The Declaration notes that "Commercial and financial information is considered 'confidential' for purposes of Exemption 4 at least where the information 'is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy.'" Allen Decl. ¶6 (quoting *Food Marketing Inst.*, 139 S. Ct. at 2366).

The Declaration states that all of the documents subject to the FOIA request had been transmitted to the FAA with a cover letter from Boeing noting that it was being provided "on a confidential basis" and are marked "BOEING PROPRIETARY." Allen Decl. ¶13. As to the "assurance of privacy" requirement, the Declaration states only that such an assurance "is evident from the context in which Boeing provided the information and the FAA's historical treatment of such information as confidential." *Id*. ¶16.

## ARGUMENT

### I.   LEGAL STANDARD

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Judicial Watch, Inc. v. Dep't of the Navy*, 25 F. Supp. 3d 131, 136 (D.D.C. 2014). "[S]ummary judgment must be granted when the pleadings, the discovery and disclosure materials on file, and any affidavits 'show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Id*. at 136 (quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247 (1986)).

10

"In the FOIA context, a district court conducts a *de novo* review of the record when evaluating a motion for summary judgment, and the responding federal agency bears the burden of proving that it has complied with its obligations under FOIA." *Muckrock, LLC v. Central Intelligence Age*ncy, 300 F. Supp. 3d 108, 118 (D.D.C.  2018). "The burden is on the agency to justify withholding the requested documents, and the FOIA directs district courts to determine de novo whether non-disclosure was permissible." *Electronic Privacy Info. Ctr. v. Dept. of Homeland Security*, 777 F.3d 518, 522 (D.C. Cir. 2015). In particular, the  "agency bears the burden of justifying the applicability of FOIA exemptions, which are exclusive and must be narrowly construed." *Mobley v. Central Intelligence Agency*, 806 F.3d 568,  580 (D.C. Cir. 2016). And, in "reviewing the agency action, the Court must analyze the facts and inferences in the light most favorable to the FOIA requester."  *Unrow Human Rights Impact Litigation Clinic v. Dept. of State*, 134 F. Supp. 3d 263, 271 (D.D.C. 2015).

## II.   FAA'S CLAIM OF CONFIDENTIALITY DOES NOT MEET THE SECOND PRONG OF THE *FOOD MARKETING* TEST BECAUSE THERE WAS NO ASSURANCE OF CONFIDENTIAL TREATMENT

### A.   <u>Treatment as Confidential Requires an Assurance of Privacy</u>

Exemption 4 protects from disclosure "commercial or financial information obtained from a person and privileged or confidential."  5 U.S.C. §552(b)(4). In *Food Marketing Institute*, the Supreme Court rejected the substantial competitive harm test for confidential treatment under Exemption 4, that had been applied by the courts for decades based on *National Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974). In its place, the Court set out a new test: that information will be considered confidential  "whenever it is customarily kept private, or at least closely held, by the person imparting it." *Food Marketing Inst.*, 139 S. Ct. at 2363.  The Court further indicated that "information might be considered

confidential only if the party receiving it provides some assurance that it will remain secret." *Id*.

The Court found it unnecessary to decide whether this second condition has to be satisfied, because it determined that this condition was satisfied in the case before it, finding that as to the submitter grocery retailers, "the government has long promised them that it will keep their information private." *Id.* The Court concluded that, "At least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential" within the meaning of Exemption 4." *Id.* at 2366.

Since *Food Marketing* was decided, this Court. in determining whether commercial information should be treated as "confidential" under Exemption has effectively applied both prongs of the test, requiring, or at least assuming the need for, a showing that the information was provided by the submitter under an assurance of privacy given by the government. *Stotter v. United States Agency for Int'l Development,* No. 14-cv-2156 (KBJ), 2020 WL 5878033 at *5 (D.D.C., Oct. 3, 2020); *Citizens for Responsibility & Ethics in Washington v. U.S. Dept. of Commerce*, No. 18-cv-3022 (CJN), 2020 WL 4732095 at *3 (D.D.C., Aug. 14, 2020) ("[a]ssuming that Exemption 4 can be satisfied here only if Commerce gave [plaintiff] some assurance of confidential treatment…."); *Besson v. United States Dept. of Commerce*, No. 18-cv-02527, 2020 WL 4500894 at *5  (D.D.C., Aug. 5, 2020)(test met where "context shows that the information was supplied under an implied assurance of confidentiality");  *Center for Investigative Reporting v. U.S. Customs & Border Protection*, 436 F. Supp. 3d 90, 112-113 (D.D.C. 2019) (government acknowledges it may need to show it provided assurance to submitters; given other deficiencies in government's position, no need to resolve but "defendants must supply at least some evidence that

this assurance was given"). As this Court stated in *Stotter*, "Although the Supreme Court did not 'need to resolve' whether the second condition it announced was necessary in every case, it is clear beyond cavil that whether the agency provided an 'assurance of privacy' when it received the information is relevant to determining whether financial information that is shared with the government is 'confidential' pursuant to the FOIA's Exemption 4."  2020 WL 5878033 at *5.

**B.   No Assurance of Privacy Was or Could Have been Given by FAA to Boeing as to the Disputed Information Categories**

In this case, the FAA is required to demonstrate that in submitting the Disputed Information Categories to the agency, the agency provided Boeing with an "assurance of privacy." That "assurance of confidentiality could have been either express or implied."  *Citizens for Responsibility and Ethics*, 2020 WL 4732095 at *3.[1]  Here, Boeing received neither type of assurance.

Boeing concedes that there was no express assurance of privacy.  In support of its Exemption 4 claim, the FAA submitted the Declaration of Jeffrey Allen, a Boeing paralegal. (Doc. No. 19-2) ("Allen Decl.").  With respect to the first prong of the test, Mr. Allen notes that Boeing provided all the information with a transmittal letter stating that it was being provided to the FAA "on a confidential basis…"  Allen Decl. ¶13.  With respect to the second prong, however—assurance of privacy—Mr. Allen does not cite any statement or communication whatsoever from the FAA.  Rather, Mr. Allen states:

> That the information was provided to the government under assurance of privacy is evident from the context in which Boeing provided the information and the FAA's historical treatment of such information as confidential.  For years, Boeing has given

---

[1]  The CREW decision relied in part on the fact that the Supreme Court, in addressing the scope of another FOIA Exemption, found implied assurance when generic circumstances surrounding the communication would "characteristically support an inference of confidentiality."  *Dept. of Justice v. Landano*, 508 U.S. 165, 179 (1993).

the FAA access to similar proprietary commercial information with the expectation that the FAA would keep the information confidential, and the FAA has done so.

Allen Decl. ¶16.  Thus Boeing claims only an *implied* assurance of privacy.  The Declaration itself cites the Department of Justice's discussion of circumstances giving rise to an implied assurance of privacy.  Allen Decl. at 5 n.4.

### 1. FAA Made Repeated Pledges of Transparency as to the Re-Certification Process and Boeing Acknowledged and Accepted Them

Any implication of confidential treatment of the Disputed Information Categories, has been precluded by the repeated public statements of the FAA, and of Boeing itself, to the effect that the agency planned to be, and has been completely transparent with the public about the re-certification process.  In March 2019, FAA Acting Administrator Daniel K. Elwell told a Senate Committee under oath that "Safety is not just a set of programs that can be 'established' or implemented.' It is a way of living and working, and it requires the open and transparent exchange of information*." Statement of Daniel Elwell; The State of Airline Safety: Federal Ovesight of Commercial Aviation, Hearing before the Senate Commerce Committee, Subcommittee on Aviation and Space* 2 (March 27, 2019) https://www.commerce.senate.gov/2019/3/the-state-of-airline-safety-federal-oversight-of-commercial-aviation (last visited Oct. 26, 2020). . Specifically as to re-certification of the 737 MAX, then-Acting Administrator Elwell stated, "The 737 MAX will return to service for U.S. carriers and in U.S. airspace only when the FAA's analysis of the facts and technical data indicate that it is appropriate.  In our quest for continuous safety improvement, *the FAA welcomes external review of our systems, processes and recommendations*." *Id.* at 9 (emphasis added).

Less than two months later, the FAA Administrator, after reviewing the specific steps to be taken in the re-certification process, stated in response to written questions that, "The FAA has

made a strong effort to be transparent in executing its State of Design responsibilities.  The FAA has shared actions, the timeline of what the agency knew and when, *and the FAA process to certify a design change for the 737 MAX and ensure it is safe to fly*."   *Status of the Boeing 737 MAX, Hearing before the  H. Comm. on Transportation & Infrastructure, Subcomm. on Aviation*, 116th Cong. 86 (2019) (emphasis added).

In December 2019, the new FAA Administrator, Steve Dickson, told a U.S. House committee that, "Today's unprecedented U.S. safety record was built on the willingness of aviation professionals to embrace hard lessons….*The FAA both welcomes and invites scrutiny of our processes and procedures*."   *The Boeing 737 MAX: Examining the Federal Aviation Administration's Oversight of the Aircraft's Certification: Hearing before the House Comm. on Transportation & Infrastructure,* 116th Cong. 14  (2019) (emphasis added). The Administrator went to say that, "We believe that transparency, open and honest communication, and our willingness to improve our systems and processes are the keys to restoring public trust in the FAA and the safety of the 737 MAX."  *Id.*

At a Senate hearing in June 2020, specifically about the FAA's oversight of aircraft certification, Administrator Dickson reiterated, in his prepared statement, that "we believe that transparency, open and honest communication  and our willingness to improve our systems and processes are the keys to restoring public trust in the FAA and in the safety of the 737 MAX when it is returned to service."  During the hearing, the Administrator stated, "I am trying to promote a culture both within the agency and really with all of our stakeholders of transparency and openness and this is an opportunity for us to do this."  *Examining the Federal Aviation Administration's Oversight of Aircraft Certification: Hearing before the committee on Commerce, Science and Transportation*,            116th            Cong.,            June            17,            2020

https://www.commerce.senate.gov/2020/6/examining-the-federal-aviation-administration-s-oversight-of-aircraft-certification at 35:37.

Boeing itself has recognized, acknowledged and supported the agency's commitment to transparency in the re-certification process. In a television interview last January, Boeing CEO David Calhoun stated that, "I think transparency of the lessons I learned over the past year. That is where Boeing fell short and we will not fall short on that subject under my leadership.  It will be uncomfortable but *we will be transparent on every subject*, whether it is training, *whether it's the certification process*, everything along the way….[Y]ou'll know what I know."   CNBC Interview,     of     David     Calhoun     (Jan.     29,     2020)     .   January     29,     2020, https://www.youtube.com/watch?v=kOuIKggApLc (last visited Oct 23, 2020) (emphasis added). A  month later, Mr. Calhoun publicly stated:

> We're going to have the most open book the world has ever seen on this subject. Transparency is what we lost for a moment and it's what we have to regain because it speaks to the trust that the world has in us. Ultimately, that's . . . people are gong to have to just be comfortable that we are going to share any and all issues that arise in the course of designing and producing airplanes, so that when things do go a little wrong, we can get ahead of them, we can do it in the open air with all of our employees and with the public.

KING-TV     Channel     5     (Seattle)     Interview,     Feb.     19,     2020     , https://www.youtube.com/watch?v=rbKCSqKRDzl  (last visited oct. 23, 2020).

### 2. Transparency About the Re-Certification Process is Inherently Inconsistent with Hiding the Disputed Information Categories

To be sure, the repeated public pledges of transparency do not mean that Boeing could not have received an assurance of privacy about documents containing only proprietary design drawings and technical specifications for aircraft components, or the actual proprietary

architecture, object or source code of software.  But the FAA's repeated pledges would be utterly inconsistent with any expectation that the FAA would withhold from the public information reflecting the actual steps planned and conducted with and by the FAA, constituting the agency's re-certification process. There is simply no way to be "transparent" about the re-certification process while withholding those categories of information  (the Disputed Information Categories): That's because those those categories of information are the *bare minimum* of information needed to understand what the FAA did  to review the proposed fixes and the results of that review.

### (a) Certification Plans; Testing methods, plans and conditions

As former FAA Acting Administrator Elwell explained to Congress in March 2019, with respect to certification plans, test plans and methods and test results:

> The FAA is directly involved in the testing and certification of new and novel features and technologies.  When as new design, or a change to an existing design, of aircraft is being proposed, the designer must apply to the FAA for a design approval….
> Once the certification basis is established for a proposed design, the FAA and the applicant develop and agree to a certification plan and initial schedule.  In order to receive a type certificate, the applicant must conduct an extensive series of tests and review to show that the product is compliant with existing standards and any special conditions, including lab tests, flight tests and conformity inspections. . . .

*Statement of Daniel K. Elwell before the Senate Commerce Committee, Subcommittee on Aviation and Space on the State of Airline Safety: Federal Oversight of Commercial Aviation* 5-6 (March 27, 2019) https://www.commerce.senate.gov/2019/3/the-state-of-airline-safety-federal-oversight-of-commercial-aviation (last visited Oct. 26, 2020).

The significance of certification plans is further explained by one of Plaintiff's experts is Michael Neely, an aerospace consultant who spent 20 years at Boeing as a system engineer and project engineer.  Mr. Neely has  worked on Boeing commercial aircraft development programs and has direct knowledge of Boeing's engineering procedures and processes, specifically the

importance of timely safety engineering application to comply with FA regulations. Declaration of Michael Neely, Ex. 2 to Statement of Material Undisputed Facts ("Neely Dec.) ¶3-5 and Ex. A to Declaration.  Mr. Neely has reviewed several of the monthly productions, with their heavy redactions, and the *Vaughn* Index.  *Id.* ¶¶18-19.  Mr. Neely explains that the "Certification Plan (CP) is a 'road map' that both the FAA and Manufacturer (Boeing) agree on and follow.  In general, the certification plan contains detailed descriptions of the type design change, methods of compliance, how much and type of testing is necessary, when and where you will use designees and schedule information." Neely Decl. Ex. D at 3. Boeing modified and/or created certification plans "for recertifying the 737-MAX MCAS changes and submitted to the FAA, thus it is critical to produce for review."  *Id.*

**(b) Means of compliance**

"Means of compliance" are the standard specifications and testing methods used by an aircraft manufacturer to demonstrate compliance with FAA regulations.  Most of these are publicly available from the major materials/equipment standards and testing body, ASTM International. *See e.g*., FAA, *Accepted Means of Compliance; Airworthiness Standards; Normal Category Airplanes*, 83 Fed. Reg. 21850 (May 11, 2018) (updating list of acceptable ASTM standards).. However, manufacturers may propose other testing methods or standards to FAA.  *Id.*

 Nothing about means of compliance, therefore, is proprietary to the manufacturer.  How someone demonstrates compliance with government regulations, by its nature, cannot be proprietary. At the same time, what testing methods were accepted by FAA from Boeing to demonstrate compliance with FAA regulations is at the heart of understanding what FAA did to review Boeing's proposed fixes.  There is no "transparency" about that process without disclosing the means of compliance.

18

**(c) Flight test plans and criteria; flight test results**

As Mr. Neely notes, "[c]ommercial flight testing is conducted to certify that the aircraft meets all applicable safety and performance requirements of the government certifying agency. . . Boeing submitted flight Test Reports to the FAA, but these reports were not produced…"  Neely Decl. Ex. D at 9.

The importance of such flight test information is underscored by another of Plaintiff's experts, Dr. Javier de Luis, an aeronautical engineer and scientist with 30 years of experience, who has been a lecturer and instructor in the Department of Aeronautics and Astronautics at MIT and was Project Manager for two key experiments onboard the Space Shuttle .  Declaration of Javier de Luis, PhD, attached to Statement of Material Undisputed Facts as Exhibit 4 ("de Luis Decl") ¶¶2-4 & Ex. A.  Dr. de Luis notes that, in its *Preliminary Summary of the FAA's Review of the Boeing 737 MAX*, *supra,* the FAA claims more than 4,000 hours of flight testing, and describes how many crews were involved  what general features were being tested and who had input into the flight plan.  "But the FAA does not disclose what the test flight plans actually were or any of the specific results of the test flights.  Without such information, there is no way to confirm whether the test flight for a particular component or feature actually demonstrated that the component or feature worked properly and safely."  de Luis Decl. ¶12.

Co- Plaintiff Paul Hudson president of FlyersRights,  himself a frequent air traveler who has flown on the 737 MAX, questions why the MAX was allowed to fly across oceans where no close by emergency landing zone is available should there be a MCAS malfunction.  He notes that, "[f]rom the limited information available, it does not appear that the test flights have accounted for flying long distances from up to several hours without MCAS and/or with only one engine."

Declaration of Paul Hudson attached to Statement of Material Undisputed Facts as Ex. 8 (Hudson Decl.") ¶14.

### (d) Safety Analyses

With respect to Safety Analyses, Mr. Neely quotes the Safety Recommendation Report of the National Transportation Safety Board on how fundamental such analyses are to the basic nature of the certification process:  "'Safety assessments proceed in a stepwise, data-driven manner to ensure that all significant single-failure conditions have been identified and all combinations of failure that could lead to hazardous or catastrophic airplane-level effects have been considered and appropriately mitigated.'"  Neely Decl. ¶15 at 8 (quoting NTSB, *Safety Recommendation Report, Assumptions Used in the Safety Assessment Process and Effects of Multiple Alerts and Indications on Pilot Performance* 5 (Sept. 19, 2019).  Mr. Neely notes that, in reviewing "the FAA's document number 26 in the Vaughn Index,.. references the aforementioned detail Safety Analysis documents where Boeing modified as part of its design change for the 737 MAX, but the FAA heavily redacted producing the actual safety analysis documents."  Neely Decl. ¶28.  Yet, "defects in the safety analyses" of the existing aircraft :contributed directly to the failures and crashes, …resulting in the deaths of hundreds of people."  *Id*. ¶29  "It would be impossible to determine whether the flaws in the 737 MAX safety analyses have been addressed without obtaining the safety analyses Boeing has submitted to the FAA in support of re-certification."  *Id*. ¶30.

Another expert, Richard Spinks, a professional engineer and project manager with thirty-eight years of experience in process safety, after reviewing the productions and the *Vaughn* Index, states that, "Information included in the produced documents is wholly insufficient to provide an independent assessment of system reliability.  Of particular concern is the absence of any information regarding the system safety analysis."  Declaration of Richard A. Spinks, P.E.,

attached as Exhibit 3 to Statement of Undisputed Material Facts ("Spinks Decl.") ¶7. Mr. Spinks notes that the FAA has actually made public a description of the functionality and failure effects of the angle of attack sensors, yet has withheld under Exemption 4 a functional description of MCAS and its susceptibility to component failures.  "Since the reliability of MCAS is dependent upon the effects of ALL system input and output devices, the arbitrary exclusion of other critical components cannot be reasonably justified." *Id*. ¶8.

Mr. Spinks concludes that, as to the Safety Analyses, "[w]itholding of critical safety information is inconsistent with the transparency promised by both Boeing and the FAA. Boeing was aware of the confidentiality clauses when they made their public commitment to transparency, effectively waiving their confidentiality rights in the interest of public safety and public trust." Spinks Decl. ¶14.

Apart from the fact that transparency inherently demands disclosure of these specific information categories, the overall commitment to transparency is simply inconsistent with withholding categories of information essential to determining the basis for any re-certification decision. Another of Plaintiff's experts, Dennis Coughlin, an avionics technician and instructor with thirty-one years of experience, states that the "lack of detail in any of the disclosures by the FAA and Boeing raises more safety questions and safety concerns than are answered." Declaration of Dennis Coughlin attached to Statement of Undisputed Material Facts as Ex. 9 ("Coughlin Decl.") ¶7. For example, with "MCAS, Boeing is proposing changes to the Flight Control Laws for MCAS that govern  its function but has not released the new settings to the aviation community so they could be independently evaluated." *Id*. ¶10. Mr. Coughlin identifies thirteen separate questions that cannot be resolved by outside experts, related to this issue, in the absence of the withheld information. *Id*. Mr. Coughlin concludes that, "The technical details of how Boeing

intends to demonstrate compliance of various equipment and software components  with FAA requirements are **essential** to assurance that any ungrounding of the MAX will be safe.  Failure to do so by the FAA and Boeing will only result in serious doubts about the safety of the MAX by experts and the general public." *Id.* ¶11 (emphasis in original).

Another of Plaintiff's experts, Gregory Travis, a software engineer with four decades of experience and an experienced pilot and expert on aviation software, notes that because the Disputed Information Categories have been withheld, it is also "not possible to assess whether or not additional failure modes may have been introduced by the changes proposed by Boeing." Declaration of Gregory Reed Travis attached as Ex. 5 to Statement of Undisputed Material Facts ("Travis Decl.") ¶12. For example, although FAA has disclosed that the MCAS system will do differential comparisons between angle of attack sensors attached to the two different  flight control computers, it is impossible to tell whether this would involve a new communication channel between those two computers, which would "likely to be a significant increase in complexity with attendant risks in terms of communication latency, race conditions, etc." *Id.*

Similarly, Gregory Barrrance, an aeronautical avionics systems and safety engineer with more than 30 years of experience, including serving as a systems and safety engineer for major aircraft manufacturers, notes that without the withheld information, it may not be possible to review two critically important issues: (i) whether the MCAS should be kept as part of the automatic trim system and (ii)_ whether any implementation of MCA is safe for return to service without a third Angle of Attack sensor.  Declaration of Gregory Barrance attached as Ex. 6 to Statement of Undisputed Material Facts ("Barrance Decl.") ¶8.

For these reasons, access to the Disputed Information Categories is essential to understanding the re-certification process.  Plaintiff's experts have confirmed that Boeing

therefore could not reasonably have expected confidential treatment, given FAA's assurances of

transparency.  Mr. Neely concludes that:

> The technical details of how Boeing intends to demonstrate compliance of various equipment and software components with FAA requirements; how Boeing intends to achieve certification of these components by the FAA; the methods of testing; and the results of testing including safety analyses and flight test results, ***are the most critical and essential information that would need to be made public in order to disclose the actual basis for any decision by the FAA to unground the aircraft***; and in order for any independent expert, aviation journalist, or public interest advocate to advise the public whether there is a sufficient basis for any FAA decision to unground the aircraft.
> It is not possible for me, personally, to express any view to the public regarding, or to inform the public about the actual basis for,  the FAA re-certification process without access to the Disputed Information Categories.
>  Without access to the Disputed Information Categories, it would be impossible for anyone to opine if Boeing's design changes for the 737 MAX, meet any code of federal regulations, re-certification requirements, and safe return of 737 MAX into service. . . .
>
> It is my understanding that the FAA specifically and publicly committed to transparency with the public regarding the re-certification process of 737 MAX . . . ***Consequently Boeing would have clearly understood the FAA could not meet its commitment to transparency without making these categories of information publicly available.***

Neely Decl. ¶¶25-27, 32 (emphasis added). Similarly, Dr. de Luis concludes that:

> Given that the FAA specifically and publicly committed to transparency with the public with respect to the re-certification process, Boeing could not possibly have believed or understood that FAA was providing any assurance that the information Boeing was providing with respect to certification plans, testing plans, details and results, means of compliance, flight test plans and results, and  safety analyses would be kept confidential.

de  Luis Decl. ¶16. These same conclusions are shared by Mr. Travis, Travis Decl. ¶¶16-17; by

Mr. Barrance, Barrance Decl. ¶¶16-17; and by another of Plaintiff's experts, Daniel Gellert, who

had a 50-year career as a commercial airline pilot, a test pilot for Boeing and an FAA official.

Declaration of Daniel Mark Gellert, attached as Exhibit 7 to Statement of Undisputed Material Facts ¶¶13-14.

Accordingly, given the repeated pledges of transparency as to the re-certification process, Boeing could not reasonably have understood or assumed that the Dispute Information Categories would be afforded confidentiality by the FAA.

### 3. With No Implied Assurance of Confidential Treatment for the Disputed Information Categories, the FAA Has Failed to Meet the *Food Marketing* Test

Given that Boeing could not reasonably have understood or assumed that the Dispute Information Categories would be afforded confidentiality by the FAA, the FAA has failed to meet the second prong of the *Food Marketing* test. The agency's public commitment to disclosure and transparency matters.  As the Department of Justice itself has stated, "notices or communications could also explicitly notify submitters of the agency's intention to *publicly disseminate* the information.  In those situations, the information, when objectively viewed in context, would be deemed to have lost its 'confidential' character under Exemption 4 …." DOJ, Office of Information Privacy*, Guidance*: *Exemption 4 after the Supreme Court's Ruling in Food Marketing Institute v. Argus Leader Media* (Oct. 3, 2019) https://www.justice.gov/oip/exemption-4-after-supreme-courts-ruling-food-marketing-institute-v-argus-leader-media (last visited Oct. 26, 2020).

These principles have already been applied in cases analogous to this one. In  *Center for Investigative Reporting v. U.S. Customs & Border Protection*, 436 F. Supp. 3d 90 (D.D.C. 2019), plaintiff submitted a FOIA request for records related to contract proposals submitted to Customs and Border Patrol  for construction of  a new border wall.  The agency withheld under Exemption 4, information from numerous e-mails by potential bidders to the agency asking questions and raising concerns about the agency's request for proposals, and containing the agency's responses

24

to those questions and concerns. Just as Boeing claims for the disputed information in this case, CBP  claimed that the withheld information would be harmful if released to competitors and therefore would be customarily treated as private. *Center for Investigative Reporting*, 436 F. Supp. 3d at 110.  The agency also claimed there was an assurance of privacy because federal procurement law protects the confidentiality of proposals submitted in response to federal government RFP's. *Id*. at 112-113..

In addition to finding the first prong of *Food Marketing* not met, this Court held that the second prong was not met either:

> Nor do the defendants point to an understanding with the submitters that questions and concerns send to the general 'point of contact  between the public and CBP for matters related to the border wall RFP's' [quoting agency declaration] would be kept confidential. In fact a reasonable submitter may well have assumed that information stored in such a public-facing e-mail account would not be confidential by default.

*Id*. at 111.  Given the failure to satisfy the first prong, the Court held that it was unnecessary to resolve whether the second prong needed to be met.  "Suffice to say that *if* Exemption 4 does so, the defendants must supply at least *some* evidence that this assurance was given."  *Id*. at 113. (emphasis in original)

Again, in *Center for Investigative Reporting v. U.S. Dep't of Labor*, No. 19-cv-05603-SK, 2020 WL 3639646 (N.D. Cal., July 6, 2020), the FOIA requester sought forms submitted by Amazon to the Occupational and Health Safety Administration (OSHA) summarizing work related injuries and illnesses at various Amazon facilities. In 2013 OSHA announced a plan publicly to post these summaries, stating strongly its belief that publicly releasing the data would help achieve safer workplaces. Three years later, in 2019,  OSHA changed its mind and publicly announced that it considered the summaries to be "confidential commercial information" that would not be released to the public.

In the FOIA action, Amazon submitted a declaration confirming that the information it submits is marked as confidential and never made public (although plaintiff had obtained some forms not so marked before OSHA changed its position). In addition to finding that the first prong of the *Food Marketing* test was not met, the Court found that the second prong had not been met:

> [W]hile it is uncertain whether an assurance of privacy is required, where, as here, Amazon indicated the opposite—that it would disclose the Form 300A—Amazon lost any claim of confidentiality it may have had.
> As the DOJ guidelines regarding Exemption 4 explain, information from submitters lose their confidential character when notices on agency websites or communications with submitters explicitly notify submitters  of the agency's intention to publicly disseminate the information.

2020 WL 3639646 at *15.  The Court pointed to OSHA's earlier public commitment that it would make the information public.  *Id*.

 In this case, the FAA expressly, publicly and repeatedly stated that it would be transparent about the re-certification process for the 737 MAX aircraft.  Boeing made similar public pledges. In these circumstances, Boeing could not possibly expected or understood that the agency would then hide from the public the minimum basic information needed to understand what happened during the re-certification process. That minimum basic information is contained in the Disputed Information Categories.  As to that information, FAA has failed to demonstrate that the second prong of the *Food Marketing* test has been met.  Accordingly that information is not entitled to treatment as "confidential" under and within the meaning of Exemption 4.

FOIA's "'limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act.'" *Center for Investigative Reporting*, 436 F. Supp. 3d at 98 (quoting *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976)).  Here there is not only a singularly strong public interest in disclosure, but disclosure is ultimately in the interests of the submitter—Boeing.  A survey conducted by FlyersRights in 2019 found that the majority of

passengers would not fly the 737 MAX when ungrounded.  Hudson Decl. ¶20 & Ex. B. Disclosure
of the minimum information necessary for independent experts to examine the basis for
ungrounding and, if justified, to confirm that the redesigned MAX is safe to fly, is in the interests
of Boeing, of the FAA and of the flying public.

### III.    FAA COMMENTS ARE NOT INFORMATION "OBTAINED FROM A PERSON"

As to one of the Disputed Information Categories—comments by the FAA—such
information is not entitled to be withheld under Exemption 4 for an additional reason: it is not
"obtained from a person."  5 U.S.C. §552(b)(4). Four documents on the *Vaughn* Index contain
such information: documents numbered 41, 45, 50 and 83.  Document number 41, for example,
contains "detailed comments from the FAA regarding failure conditions in the Functional Hazard
Assessment."   Similarly, document number 45 contains "FAA technical comments and Boeing
responses regarding several subjects…."

The comments created by FAA itself are not covered by Exemption 4 because
"[i]nformation 'generated within the Government' is not "obtained from a person" and, thus, does
not under the exemption."  *Center for Auto Safety v. U.S. Dep't of Treasury*, 133 F. Supp. 3d, 109,
120 (D.D.C. 2015) (quoting *Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392,
404 (D.C. Cir. 1980), *abrogated on other grounds, U.S. Dep't of State v. Wash. Post Co.*, 456 U.S.
595 (1982)). To be sure, information from an outside person and actually incorporated into an
agency record can be covered by the exemption.  But when "information 'constitutes that agency's
own analysis,' . . . 'such information is the agency's information and not "obtained from a person"
under Exemption 4.'"  *Center for Auto Safety*, 133 F. Supp. 3d at 123 (quoting *S. All. For Clean
Energy v. U.S. Dep't of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012)).

Case 1:19-cv-03749-CKK   Document 21-1   Filed 10/28/20   Page 28 of 30


Thus, in *American Small Business League v. U.S. Dep't of Defense*, 411 F. Supp. 3d 824 (N.D. Cal. 2019),  the FOIA requester sought subcontracting plans of defense contractors as well as the agency's evaluation of how those plans comply with regulatory requirements. The Court held that the agency evaluations could not be covered by Exemption 4:

> As an initial matter, only information originating from the companies themselves can be considered information that they customarily and actually treated as private…..In the instant action, that means that government assessments and evaluations cannot be considered "confidential" information for purposes of Exemption 4. This includes, for example, the government's evaluations of a contractor's compliance with regulatory requirements….. No one can reasonably argue that those evaluations by the government constituted information that belonged to the companies rather than the  government.  The information generated by the government must be disclosed.

*American Small Bus. League*, 411 F. Supp. 3d at 830.   In this case as well, the FAA comments "generated by the government" and contained in the four documents noted "must be disclosed."

In addition, document number 32 contains comments of the European Union for Aviation Safety Agency ("EASA"). Although EASA could be a "person" under Exemption 4, there is no evidence in this record that EASA had any objection to disclosure of its comments. Those comments should therefore be disclosed as well.

## CONCLUSION

For the reasons set forth above, with respect to the Disputed Information Categories, there is no genuine issue of material fact and Plaintiff is entitled to judgment as a matter of law that this information cannot be withheld under Exemption 4 and must be produced by the FAA to Plaintiff. Plaintiff's Motion for Summary Judgment should therefore be granted.


Respectfully submitted,

_/s/ Joseph E. Sandler_

October 28, 2020

Joseph E. Sandler, DC Bar #255919
Christina E. Bustos
SANDLER REIFF LAMB ROSENSTEIN &
BIRKENSTOCK, P.C.
1090 Vermont Ave., N.W. Suite 750
Washington, D.C. 20005
Tel: (202) 479-1111
Fax: (202) 479-1115
sandler@sandlerreiff.com

Of Counsel:

Andrew Applebaum
Legal Counsel
Flyers Rights Education Fund
1530 P St NW
Washington, DC 20005

_Attorneys for Plaintiff_

**CERTIFICATE OF SERVICE**

29

I hereby certify that on this 28th day of  October, 2020, I caused the foregoing

Plaintiff Flyers Rights Education Fund's Memorandum in Support of Motion for Summary

Judgment, Plaintiff's Statement of Material Facts as to Which There Is No Genuine Dispute

and Proposed Order, to be filed via the Court's ECF system, which caused a copy to be

electronically served on all counsel of record.


*/s/ Joseph E. Sandler*


Joseph E. Sandler
Counsel for Plaintiffs