UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FLYERS RIGHTS EDUCATION FUND, INC, *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>FEDERAL AVIATION ADMINISTRATION,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)     Civil Action No. 19-3749 (CKK)<br>)<br>)<br>)<br>)<br>) |

**COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN, D.C. Bar #924092
Chief, Civil Division

DEREK S. HAMMOND
D.C. Bar #1017784
Assistant United States Attorney
555 Fourth Street, NW
Washington, DC 20530
202-252-2511
Derek.hammond@usdoj.gov

Dated: November 18, 2020                    *Attorneys for the United States of America*

**TABLE OF CONTENTS**

**TABLE OF AUTHORITIES** ................................................................................... ii

**BACKGROUND** ........................................................................................................ 1

**STANDARDS** ............................................................................................................ 3

**ARGUMENT** ............................................................................................................. 4

   **I.**   **THE FAA WITHHELD ONLY EXEMPT INFORMATION UNDER FOIA EXEMPTION 4.** .......................................................................................... 5

      A. All of The Information Still at Issue is Comprised of Boeing's Commercial Information, which it Customarily and Actually Treats As Confidential.................... 6

      B. The Withheld Information was Obtained from a "Person." ...................................... 17

      C. Boeing Provided The Information At Issue to The Government Under Express and Implied Assurances of Privacy. ................................................................. 19

      D. Plaintiffs' Contention That Exemption 4 Does Not Apply to the Disputed Categories of Information Because Boeing Could Not Have Provided That Information Under An Assurance of Privacy is Without Merit....................................................... 22

      E. Disclosure of Boeing's Confidential Commercial Information Would Lead to Foreseeable Harm to Boeing's Commercial Interests and Would Interfere with the FAA's ability to obtain Necessary Safety Information............................................. 28

   **II.**  **THE FAA RELEASED ALL REASONABLY SEGREGABLE INFORMATION**. 30

**CONCLUSION** ......................................................................................................... 31

# TABLE OF AUTHORITIES

*Cases*                                                                        *Page(s)*

*Allnet Commc'n Servs., Inc. v. FCC*,
   800 F. Supp. 984 (D.D.C. 1992) ................................................................. 17

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ......................................................................................... 3

*Armstrong v. Exec. Office of the President*,
   97 F.3d 575 (D.C. Cir. 1996) ....................................................................... 30

*Baker & Hostetler LLP v. U.S. Dep't of Commerce*,
   473 F.3d 312 (D.C. Cir. 2006) ................................................................. 6, 16

*Bd. of Trade v. CFTC*,
   627 F.2d 392 (D.C. Cir. 1980) ....................................................................... 6

*Besson v. U.S. Dep't of Commerce*,
   Civ. A. No. 18-2527 (APM), 2020 WL 4500894 (D.D.C. Aug. 5, 2020) ............... 19

*Brayton v. Office of U.S. Trade, Rep.*,
   641 F.3d 521 (D.C. Cir. 2011) ....................................................................... 3

*Canning v. Dep't of Justice*,
   567 F. Supp. 2d 104 (D.D.C. 2008) ............................................................. 30

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ......................................................................................... 3

*Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*,
   436 F. Supp. 3d 90 (D.D.C. 2019) ......................................................... 28, 30

*Defenders of Wildlife v. U.S. Border Patrol*,
   623 F. Supp. 2d 83 (D.D.C. 2009) ................................................................. 3

*Elec. Privacy Info. Ctr. v. DHS*,
   117 F. Supp. 3d 46 (D.D.C. 2015) ............................................................... 17

*Food Mktg. Inst. v. Argus Leader Media*,
   139 S. Ct. 2356 (2019) ............................................. 6, 19, 23, 24, 25, 27, 29, 30

*Gallant v. NLRB*,
   26 F.3d 168 (D.C. Cir. 1994) ..................................................................... 4, 5

*GSA v. Benson*,
   415 F.2d 878 (9th Cir. 1969) ....................................................................... 19

*Gulf & W. Indus. v. United States*,
    615 F.2d 527 (D.C. Cir. 1979) .......................................................................... 17, 18

*Judicial Watch, Inc. v. Export–Import Bank*,
    108 F. Supp. 2d 19 (D.D.C. 2000) ........................................................................ 17

*Larson v. Dep't of State*,
    565 F.3d 857 (D.C. Cir. 2009) ................................................................................ 4

*McGehee v. CIA.*,
    697 F.2d 1095 (D.C. Cir. 1983) .............................................................................. 3

*Mead Data Cent., Inc. v. U.S. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ......................................................................... 5, 30

*Media Research Ctr. v. U.S. Dep't of Justice*,
    818 F. Supp. 2d 131 (D.D.C. 2011) ..................................................................... 3, 4

*Military Audit Project v. Casey*,
    656 F.2d 724 (D.C. Cir. 1981) .......................................................................... 4, 5

*Nat'l Parks & Conservation Ass'n v. Morton*,
    498 F.2d 765 (D.C. Cir. 1974) .............................................................................. 30

*Nat'l Treasury Employees Union v. U.S. Customs Serv.*,
    802 F.2d 525 (D.C. Cir. 1986) .......................................................................... 4, 5

*Natural Res. Defense Council, Inc. v. Nuclear Regulatory Comm'n*,
    216 F.3d 1180 (D.C. Cir. 2000) .............................................................................. 4

*Perrin v. United States*,
    444 U.S. 37 (1979) ............................................................................................... 23

*Perry v. Block*,
    684 F.2d 121 (D.C. Cir. 1982) ................................................................................ 4

*Pub. Citizen Health Research Grp. v. FDA*,
    704 F.2d 1280 (D.C. Cir. 1983) .............................................................................. 6

*Pub. Citizen Health Research Grp. v. NIH*,
    209 F. Supp. 2d 37 (D.D.C. 2002) ........................................................................ 18

*S. All. for Clean Energy v. U.S. Dep't of Energy*,
    853 F. Supp. 2d 60 (D.D.C. 2012) ........................................................................ 18

*Shapiro v. Dep't of Justice*,
    Civ. A. No. 12-313, 2020 WL 3615511 (D.D.C. July 2, 2020) .............................. 19

*Skybridge Spectrum Found. v. FCC*,
    842 F. Supp. 2d 65 (D.D.C. 2012) .................................................................. 27, 28

*Spirko v. U.S. Postal Serv.*,
    147 F.3d 992 (D.C. Cir. 1998) ....................................................................... 4, 5

*Sussman v. U.S. Marshals Serv.*,
    494 F.3d 1106 (D.C. Cir. 2007) ......................................................................... 30

*U.S. Dep't of Commerce*,
    Civ. A. No. 18-3022 (CJN), 2020 WL 4732095 (D.D.C. Aug. 14, 2020) ......................... 19, 22

*U.S. Dep't of Justice v. Tax Analysts*,
    492 U.S. 136 (1989) ...................................................................................... 4

*Vaughn v. Rosen*,
    484 F.2d 820 (D.C. Cir. 1973) ........................................................................... 5

*Wash. Post Co. v. HHS*,
    690 F.2d 252 (D.C. Cir. 1982) ........................................................................... 6

*Washington  v. U.S. Dep't of Labor*,
    478 F. Supp. 2d 77 (D.D.C. 2007) ................................................................... 3, 4, 5

**Statutes**

5 U.S.C. § 552(a)(4)(B) .................................................................................... 4

5 U.S.C. § 552(a)(8)(A) ................................................................................... 28

5 U.S.C. § 552(b) ....................................................................................... 4, 30

5 U.S.C. § 552(b)(4) .................................................................................... 5, 23

**Rules**

Fed. R. Civ. P. 56(a) ..................................................................................... 3

**Other Authorities**

85 Fed. Reg. 73430 (Nov. 18, 2020) ..................................................................... 1

Undersigned counsel, on behalf of Defendant, the Federal Aviation Administration ("FAA" or the "Agency"), respectfully submits this Memorandum of Points and Authorities in Support of its Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment.  For the reasons stated below, judgment should be entered in favor of the Agency pursuant to Federal Rule of Civil Procedure ("Rule") 56.

## BACKGROUND

Defendant respectfully refers the Court to the accompanying Statement of Material Facts Not in Genuine Dispute for a complete statement of the factual background of this matter.  To briefly summarize, however, in March 2019, aviation authorities around the world, including the FAA, issued orders grounding the Boeing 737 MAX aircraft, a twin-engine jet airplane manufactured by Boeing Company ("Boeing"), after it was involved in two fatal accidents in late 2018 and early 2019.  Thereafter, the FAA instructed Boeing to make certain design changes to the aircraft and, as part of the process to certify those changes and unground the plane, Boeing submitted a number of complex and highly technical documents to the FAA, which contained Boeing's confidential and proprietary business information.[1]

On October 31, 2019, Plaintiff FlyersRights submitted a Freedom of Information Act ("FOIA") request to the FAA in which it sought records concerning the FAA's review of the Boeing 737 MAX and, shortly thereafter, Plaintiffs' initiated this lawsuit.  During the course of

---

[1]    On today's date, following a comprehensive and methodical safety review process that took 20 months to complete, the FAA took several steps to pave the way for the Boeing 737 MAX to return to commercial Service, including rescinding the order that grounded the 737-MAX, and publishing an Airworthiness Directive specifying design changes that must be made before the aircraft returns to service. *See Rescission of Emergency Order of Prohibition* (Nov. 18, 2020), *available*                                                                                                      *at* https://www.faa.gov/foia/electronic_reading_room/boeing_reading_room/media/737_MAX_Res cission_of_Grounding_Order.pdf; *Airworthiness Directive; Boeing Company Airplanes*, 85 Fed. Reg. 73430 (Nov. 18, 2020).

the litigation, the parties agreed to narrow the scope of the FOIA request to encompass only those documents in possession of the Agency on which the agency would actually rely in making any decision about the return to service of the Boeing 737 MAX airplanes.  The parties then further narrowed the responsive records to those contained in the *Vaughn* index filed on October 9, 2020.

Between March and September 2020, the FAA processed all records responsive to FlyersRights's request.  In producing these records, the FAA withheld information pursuant to FOIA Exemptions 4 and 6.  After the FAA filed a *Vaughn* index and supporting declaration detailing the FAA's withholdings, the parties met, conferred, and agreed that the only issues still in dispute concerned the FAA's withholding of seven categories information under FOIA Exemption 4.  These categories are: (1) certification plans; (2) testing methods, plans, and conditions; (3) means of compliance; (4) flight test plans and criteria; (5) flight test results; (6) safety analyses; and (7) FAA and foreign government comments.  Plaintiffs do not contend, however, that the FAA's withholding of "technical drawings or design details of the aircraft, or its systems and components or software" is in any way improper.  *See* Pls.' Mem. Of Points and Authorities In Supp. Of Mot. Summ. J. ("Pls.' Mem.") at 2, 16-17, ECF No. 21-1.

On October 28, 2020, Plaintiffs filed their Motion for Summary Judgment.  Pls.' Mot. for Summ. J., ECF No. 21.  In their supporting memorandum, Plaintiffs do not dispute that the information at issue is commercial within the meaning of Exemption 4 or that Boeing customarily and actually treated this information as confidential.  *See generally* Pls.' Mem.  Rather, their principle argument is that, because FAA officials and Boeing executives made generalized statements concerning openness and transparency in the process of ungrounding the 737 MAX, Boeing could not have understood that they were providing their confidential commercial information to the government under any assurance of privacy.  *See* Pls.' Mem. at 14-24.  Under

their theory, without such an assurance, Exemption 4 does not apply.  *See id.* at 24-27.  As demonstrated below, Plaintiffs' arguments are meritless.

## STANDARDS

Summary judgment is appropriate when the pleadings and evidence "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  It is up to the party moving for summary judgment to demonstrate the absence of a genuine issue of material fact.  *See Celotex*, 477 U.S. at 323.  A genuine issue is one that "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial."  *Id.*

"[T]he vast majority of FOIA cases can be resolved on summary judgment."  *Brayton v. Off. of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011); *see also Media Research Ctr. v. Dep't of Justice*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011) ("FOIA cases typically and appropriately are decided on motions for summary judgment.") (quoting *Defenders of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 2d 83, 87 (D.D.C. 2009)).  A government agency may obtain summary judgment in a FOIA case by relying on "relatively detailed" and "nonconclusory" declarations.  *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983).  "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *Citizens for Responsibility & Ethics in Wash. ("CREW") v. Dep't of Labor*,

478 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).   "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"   *Media Research Ctr.*, 818 F. Supp. 2d at 137 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

Once the court determines that an agency has released all non-exempt material, it has no further judicial function to perform under FOIA and the FOIA claim is moot.   *See Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982).

## ARGUMENT

FOIA requires that an agency release responsive information unless it is protected from disclosure by one or more of the Act's nine exemptions.   *See* 5 U.S.C. § 552(b); *see also Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 150–51 (1989).   The agency bears the burden of demonstrating that any withheld information falls into one or more of those exemptions.   5 U.S.C. § 552(a)(4)(B); *see also Nat. Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000).   An agency may meet its burden to establish the applicability of an exemption by providing a *Vaughn* index that "permit[s] adequate adversary testing of the agency's claimed right to an exemption."   *Nat'l Treasury Emps. Union v. U.S. Customs Serv.*, 802 F.2d 525, 527 (D.C. Cir. 1986) (citing *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977); *Vaughn v. Rosen*, 484 F.2d 820, 828 (D.C. Cir. 1973)).   The index must contain "an adequate description of the records" and "a plain statement of the exemptions relied upon to withhold each record."   *Nat'l Treasury Emps.*, 802 F.2d at 527 n. 9.   Although a Vaughn index is a common device used by agencies to meet their burden of proof, "the Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *CREW*, 478 F. Supp. 2d at 80 (quoting *Military Audit Project*, 656 F.2d at 738); *see also Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 998 n.4 (D.C. Cir. 1998) ("The form of the *Vaughn* index is unimportant and affidavits providing similar information can suffice.") (citing *Gallant v. NLRB*, 26 F.3d 168, 172-73 (D.C. Cir. 1994)).

In this case, the only remaining dispute between the parties is the FAA's withholding of certain information pursuant to Exemption 4 of the FOIA. As demonstrated below, because the assertion of that exemption was proper and because the FAA has released all reasonably segregable material, this Court should enter judgment in favor of the Agency.

## I.  THE FAA WITHHELD ONLY EXEMPT INFORMATION UNDER FOIA EXEMPTION 4.

Exemption 4 protects from disclosure "trade secrets and commercial or financial information obtained from a person and privilege or confidential."  5 U.S.C. § 552(b)(4).  The courts in this Circuit have long held that "commercial or financial information" are broad terms to be given their "ordinary meanings" and are protected so long as the submitter of the information has a "commercial interest" in them.  *Pub. Citizen Health Rsch. Grp. v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983) (citing *Wash. Post Co. v. Dep't of Health and Human Servs.*, 690 F.2d 252, 266 (D.C. Cir. 1982) and *Bd. of Trade v. CFTC*, 627 F.2d 392, 403 (D.C. Cir. 1980)); *Baker & Hostetler LLP v. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006).  Such information is "confidential" under Exemption 4 if it is "customarily kept private, or at least closely held, by the person imparting it."  *Food Mktg. Inst. v. Argus Leader Media* ("*Argus Leader*"), 139 S. Ct. 2356, 2363 (2019).  In *Argus Leader*, the Supreme Court held that commercial or financial information is "confidential" within the meaning of Exemption 4 "[a]t least" where the information is "customarily and actually treated as private by its owner" and, perhaps, "provided to the

government under an assurance of privacy." 139 S. Ct. at 2366. As demonstrated below, the FAA properly withheld under Exemption 4 the confidential commercial information that Boeing submitted to the government.

> **A.** **All of The Information Still at Issue is Comprised of Boeing's Commercial Information, which it Customarily and Actually Treats As Confidential.**

Plaintiffs challenge the FAAs withholding of seven categories of information under Exemption 4. *See* Pls.' Mem. at 9. In each case, the information being withheld qualifies as "commercial" information because, as shown below, Boeing has a clear commercial interest in that information and, given this interest, it customarily and actually treats it as confidential.

> **1.** Certification Plans

Plaintiffs first challenge the FAA's withholding of certification plans. *See* Pls.' Mem. at 9; *Vaughn* Index at 3-6, 11, 13, 57, 70, 100, ECF No. 19-1. In each airplane certification project, a certification plan is created. Declaration of Susan Cabler ("Cabler Decl.") ¶ 22. Generally speaking, "[c]ertification plans tie together specific methods of compliance with the data about a design that supports compliance with each applicable regulatory standard, thereby providing an explicit roadmap for achieving compliance to the complex set of applicable FAA regulations." Declaration of David Polland ("Polland Decl.") ¶ 8. These plans contain "a detailed technical description (including figures) of the applicant's design, the desired schedule for the project, roles and responsibilities between the applicant and FAA, information on the FAA's level of involvement that includes individual company representatives involved in each deliverable review, and what means of compliance the applicant will use, and how the applicant will show that their airplane design complies with the applicable FAA regulations including a detailed discussion mapping specific regulatory requirements and guidance material to specific compliance deliverables summarized in the certification plan." Cabler Decl. ¶ 22

This information "can be of extremely high value both to experienced manufacturers seeking to certify products as well as new entrants." Polland Decl. ¶ 8. Indeed, "[a]ccess to the detailed proprietary information in certification plans could save a competitor thousands of hours of engineering effort and reduce time to market for its products, both of which may be a key competitive advantage in the aerospace industry." Polland Decl. ¶ 8. Because "certification plans [] provide a comprehensive and detailed description of the airplane product that is being certificated . . . significant information can be derived about the product's detailed attributes and performance, which could then be used by Boeing's competitors to their advantage to improve their products, or influence marketing strategies in favor of their products." Polland Decl. ¶ 10. Furthermore, "[t]he FAA does not generally prescribe the manner in which an aircraft manufacturer establishes compliance with the regulatory design requirements" and, thus, "publicly disclosing Boeing's approach to compliance will allow competitors to gain extremely valuable insights into the methods Boeing developed over decades to demonstrate compliance." Polland Decl. ¶ 9. And, "even if a competitor does not follow the exact path to compliance that Boeing took, it would gain considerable insights by learning how the FAA responded to Boeing's compliance proposals." Polland Decl. ¶ 9.

In light of their significant value, certification plans "are carefully controlled as Boeing proprietary data." Polland Decl. ¶ 11. These "[c]ontrols on distribution extend to limits on disclosing certification plans to foreign national airworthiness authorities and suppliers, where typically only the specific data pertinent to a given activity is shared under express understandings that the information will be kept confidential and protected from disclosure." Polland Decl. ¶ 11

Here, "Boeing's certification plan related to the 737 MAX return to service was developed by Boeing . . . and reviewed by the FAA." Cabler Decl. ¶ 23. "It describes in detail aspects of the

design changes for the 737 MAX Flight Control Computers including design figures (schematics), the evolution of all of the technical changes that were assessed and incorporated over the course of the certification project, a summary of the system safety conditions evaluated, and detailed software evaluations."   Cabler Decl. ¶ 23.   In light of the considerations noted above, this "certification plan is treated by Boeing and by the FAA as confidential commercial information." Cabler Decl. ¶ 23; Polland Decl. ¶¶ 7, 11.  And "because the certification plan's purpose is to detail [Boeing]'s plan to show compliance for each design change, the applicant's proprietary data is so intermingled with the plan that it would be impossible to segregate and release the certification plan in any coherent manner without also revealing the technical data that all parties agree is protected under Exemption 4."  Cabler Decl. ¶ 23.

### 2.   Testing Methods, Plans, and Conditions

Plaintiff also seeks disclosure of Boeing's test methods, plans, and conditions.  *See* Pls.' Mem. at 9; *Vaughn* Index at 1, 5, 6, 46, 48, 60, 75, 98.  Boeing's test plans include test methods to "fully describe how the planned testing will meet the regulatory guidance and requirements, including technical specifications and any related test equipment specifications to ensure that the test will accurately represent the tested conditions and produce results which represent a compliance showing."  Cabler Decl. ¶ 25.  Revealing Boeing's methods would also necessarily reveal substantial technical information about Boeing's designs "because the testing activities must be tailored to the specific attributes of each design."  Polland Decl. ¶ 12; *See also* Cabler Decl. ¶ 24.  And "[f]or design components such as integrated avionics software, the method of testing all possible conditions in a manner that yields predictable and reproducible results can itself be highly proprietary because the test methods can be as innovative as the product."  Polland Decl. ¶ 14.   Furthermore, "the nature and function of Boeing's available test facilities reveals commercially sensitive details about Boeing's capabilities and expertise."  Polland Decl. ¶ 13.

Thus, revealing Boeing's testing methods, plans and conditions would provide "competitors with a significant benefit in terms of reducing the investment they otherwise would have to make to develop similar capabilities, as well as the time that would otherwise be necessary to develop comparable experience."  Polland Decl. ¶ 15

3.   Means of Compliance

Plaintiffs' next challenge the withholding of Boeing's means of compliance.  *See* Pls.' Mot. at 9; *Vaughn* Index at 3-6, 11-12, 14, 17, 21, 23-24, 37, 42, 49, 60, 64, 68, 71, 73, 75, 81, 91, 96, 97, 104, 107.  Means of compliance are "descriptions of how an applicant will show compliance to applicable FAA regulations."  Cabler Decl. ¶ 26.  "An applicant's design will dictate how compliance will be shown." Cabler Decl. ¶ 26.  "For example, different materials (metallic materials, composite materials, flame retardant materials) will have different means of showing compliance to the regulations."  Cabler Decl. ¶ 26.  "There are many ways to show compliance and they stem from an applicant's unique certification experience, previous FAA-acceptable means of compliance developed by the applicant and used in other certification projects, or some new compliance methodology that supports a new or novel feature in the design proposed by an applicant."  Cabler Decl. ¶ 26.  "Elements of the design are expressly identified and described as a means of compliance is developed and subsequently agreed to by the FAA."  Cabler Decl. ¶ 26.

"Although the FAA's airworthiness standards apply to all applicants for product certification, the regulations do not generally prescribe means of compliance."  Polland Decl. ¶ 16. Boeing's means of compliance "have been developed by Boeing over time using experience and lessons from numerous design projects and are, therefore, unique to the Boeing company."  Cabler Decl. ¶ 28.  These processes or procedures would provide other applicants without the benefit of such experience exposure to use Boeing processes, taking advantage of the time and resources Boeing has invested in developing those processes.  Boeing's means of compliance are therefore

valuable to the company because "[u]nderstanding Boeing's approaches to compliance would provide a competitor with key information that it can readily apply to its own products, even where there are differences in design features." Polland Decl. ¶ 16; *see also* Cabler Decl. ¶ 28. As such, Boeing's "means of compliance are held closely as confidential because they represents the unique method by which compliance was shown, and therefore can reveal substantial commercially sensitive information regarding Boeing's processes and product design features." Polland Decl. ¶ 17. In this case, "information contained in the responsive records consisting of or describing Boeing's means of compliance is completely proprietary because it describes each piece of the proposed design change that is new or different from previously certificated models, and explains how Boeing will show that each piece complies with applicable FAA regulations and standards." Cabler Decl. ¶ 27.

Plaintiffs argue, however, that, because there exist means of compliance that are publicly available, there is "nothing about means of compliance [that] is proprietary to the manufacturer." Pls.' Mem. at 18. While it is true that FAA and some standards organizations publish means of compliance that have already been accepted, as Plaintiffs acknowledge, applicants can, and often do, "develop their own means of compliance that are specific to their airplane design, which is not publicly available and instead is maintained within the manufacturer's company as confidential business information or trade secret information." Cabler Decl. ¶ 29; *see also* Pls.' Mem. at 18 (noting that "manufacturers may propose other testing methods or standards to FAA"). In this case, "Boeing's means of compliance does not take advantage of publicly available means of compliance methods, and instead was developed by Boeing to show compliance with FAA regulations and standards specifically related to its 737 MAX aircraft." Cabler Decl. ¶ 29. In fact, "[t]he means of compliance developed by Boeing and described in the responsive records are not

publicly available." Cabler Decl. ¶ 27. Accordingly, the fact that there exist other means of compliance that are publicly available does nothing to diminish the value of Boeing's proprietary means of compliance or otherwise suggest that they are not "commercial" information for purposes of Exemption 4.

                4.      <u>Flight Test Plans and Criteria</u>

Plaintiffs also seek disclosure of Boeing's flight test plans and criteria. *See* Pls.' Mot. at 9; *Vaughn* index at 2, 50-51, 55, 76-77. "Test plans often provide some of the substantiating data to show how an applicant's design meets FAA regulations on flight performance and handling characteristics." Cabler Decl. ¶ 30. These plans are "specific to a particular manufacturer's airplane design as they contain descriptions of the airplane's flight control systems, flight characteristics such as stability and maneuverability, and the flight control laws and algorithms encoded in the flight control computer." Cabler Decl. ¶ 30. They are also "dependent on the particular manufacturer's airplane design as they are based on design characteristics like where wings are mounted on the fuselage (high or low), where the engines are mounted (on the fuselage or on the wings), what kind of tail the airplane has (e.g., a T-tail, a V-tail, a cross-shaped tail), and how the plane responds in high-speed and low-speed conditions." Cabler Decl. ¶ 30

Boeing "developed its flight test plans to show how the 737 MAX will meet particular handling or performance characteristics." Cabler Decl. ¶ 31. "For example, the flight test plan may describe some feature that the Boeing has developed specifically for the 737 MAX, and then explain how Boeing intends to prove its design is safe." Cabler Decl. ¶ 31. Because "airplane flight test plans and criteria reveal technical information about products and systems being tested as well as Boeing's means of compliance," Boeing treats this information as proprietary and confidential." Polland Decl. ¶ 18. Indeed, revealing this information could provide competitors "significant insights about Boeing's products and processes that would benefit Boeing's

competitors if they were to be disclosed." Polland Decl. ¶ 19.  Even assuming that the flight test plan could be released, "it would be impossible to release something called a 'flight test plan' without revealing the technical data, design drawings, and other underlying data that is completely intertwined with the flight plan." Cabler Decl. ¶ 31

### 5. Flight Test Results

Next, Plaintiffs challenge the withholding of flight test results. *See* Pls.' Mot. at 9; *Vaughn* index at 2, 76, 77.  "Flight test results provide highly detailed information regarding airplane performance."  Polland Decl. ¶ 20; *see also* Cabler Decl. ¶ 32.  "From this information, key airplane performance data over a broad range of flight conditions can be determined."  Polland Decl. ¶ 20; *see also* Cabler Decl. ¶ 32.  "Such data can readily be used by competitors for comparative marketing assessments as well as highlighting specific product improvements that they could implement to close performance gaps between their products and Boeing's."  Polland Decl. ¶ 20; *see also* Cabler Decl. ¶ 32.

### 6. Safety Analyses

Plaintiffs' also challenge the withholding of Boeing's safety analyses.  *See* Pls.' Mem. at 9, *Vaughn* Index at 3, 9, 18, 23, 26, 28, 37, 43-44, 63, 65.  "Aircraft safety analyses are essential elements of aircraft certification activities that are foundational to a product's integrity."  Polland Decl. ¶ 21.  They are both highly detailed and complex and contain information about the system being analyzed, including its performance and functionality, in granular detail.  Polland Decl. ¶ 21. This granular detail describes not only the product but also the required capability of each of its critical design elements.  Polland Decl. ¶ 21.  Publicly revealing such information would provide competitors with "detailed insights into Boeing's detailed designs and systems, to perform comparative product assessments, and would inform their competitive marketing strategies."  Polland Decl. ¶ 21.  Like Boeing's certification plans and means of compliance, "Boeing's safety

analyses provide a roadmap for how Boeing demonstrates compliance with specific airworthiness standards."  Polland Decl. ¶ 22; *see also* Cabler Decl. ¶ 33.  "As such, public release of such information would be of great value to Boeing's competitors because it would allow them to save time and money in their own compliance activities, especially where competitors learn the methods Boeing used that the FAA found to be acceptable."[2]  Polland Decl. ¶ 22

### 7.    FAA and foreign government agency comments

Finally, Plaintiff challenges the withholding of certain records that include comments by the FAA and a foreign government agency.  *See* Pls.' Mot. at 9; *Vaughn* Index at 32, 41, 45, 50, 83.  The FAA withheld in full 79 pages of records that contain FAA comments to Boeing certification documents and produced eight pages of records containing FAA comments with redactions to five of those pages.  *See* Cabler Decl. ¶ 35; *Vaughn* Index at 41, 45, 50, 83.  These withheld FAA comments include discussions detailing very specific failure conditions within the proposed analyses as they matured over time and the questions that the FAA asked to ensure that the analyses supported compliance included requests for detailed technical data, which themselves also contained technical data.  Cabler Decl. ¶ 36.  The withheld comments are not, for example, document-formatting comments that instruct Boeing to make stylistic or non-substantive amendments; instead, they describe and ask questions about Boeing's technical data and methods

---

[2]      Plaintiffs argue that, because the FAA has publicly released a description of the functionality and failure effects of the angle of attack sensors, the agency's withholding of a functional description of the MCAS and its susceptibility to component failures is inconsistent with this previous release.  *See* Pls.' Mem. at 21.  The descriptions that the FAA has publicly released are descriptions in layman's terms of common aspects of aircraft design, but the safety analysis information that FlyersRights requests the FAA release is different.  Cabler Decl. ¶ 34. These analyses are intrinsic to Boeing's design of its proprietary flight control software, and reveal elements of how Boeing designed those proprietary features.  Cabler Decl. ¶ 34.  Like the other categories described above, the system safety analyses heavily incorporate and describe Boeing's technical data and it would be impossible to release safety analysis information without also releasing the underlying aircraft design description and data.  Cabler Decl. ¶ 34.

of compliance.  Cabler Decl. ¶ 36.  These comments not only incorporate technical data received from Boeing, but if released would also reveal information about the methods of compliance that Boeing has asserted it spent significant time and resources developing.  Cabler Decl. ¶ 36.

Moreover, the 79 pages of records withheld in their entirety were provided to FAA by Boeing in connection with revised versions of certain deliverables.  Cabler Decl. ¶ 37.  They did not originate solely within the FAA. Cabler Decl. ¶ 36.  These pages consisted of charts that included FAA's comments to earlier versions of the project deliverable to which they were attached, note Boeing's position with respect to those comments, and summarize changes that Boeing made to accommodate the FAA's comments.  Cabler Decl. ¶ 37.  With respect to the remaining eight pages, the FAA redacted only information that reveals Boeing proprietary information, and produced all releasable information.  Cabler Decl. ¶ 37.  The redacted information, while summarized by the FAA in its comments, originated from Boeing's project deliverables. Cabler Decl. ¶ 37

The FAA also withheld in full one page consisting of Boeing's description of comments it received to its certification documents from EASA.  Cabler Decl. ¶ 35; *Vaughn* Index at 32. "[T]hese comments pertain to EASA's validation of Boeing's 737 MAX design changes related to the MCAS update."  Cabler Decl. ¶ 38.  "As with the FAA comments, the withheld EASA comments reference design aspects, technical design-specific data, and acceptable means of compliance information."  Cabler Decl. ¶ 40.  In addition to Boeing's summary of EASA's comments, this document includes "Boeing's summary of steps it took to address EASA's

comments."  Cabler Decl. ¶ 40.  "Release of these comments would reveal both technical data and proprietary aspects of Boeing's methods of compliance."[3]  Cabler Decl. ¶ 40.

*     *     *

To summarize, all of the withheld information in dispute is "commercial" because "Boeing used it in its commercial and business activities to certify the design change of an airplane that it manufactures and sells."  Cabler Decl. ¶ 47.  Generally speaking, the documents at issue contain "highly detailed technical information about Boeing products, such as descriptions of aircraft systems, as well as information about the methods by which Boeing demonstrates compliance with applicable regulations in order to obtain certification."  Polland Decl. ¶ 5; *see also* Cabler Decl. ¶ 48.  They were "largely prepared by Boeing's engineering teams" and "reflect and embody the technical know-how and expertise that Boeing developed over decades of designing, certifying, and manufacturing aircraft."  Polland Decl. ¶ 6.  This information was developed by Boeing "at considerable time and expense," Declaration of Jeffrey Allen ("Allen Decl.") ¶ 11, ECF No. 19-2, and its "decades of efforts established the very valuable ability of Boeing to define and execute the complex activities required for product compliance with the FAA's regulations,"  Polland Decl. ¶ 6.  If this information were made public, it "could be used advantageously by other manufacturers for very little time investment and developmental costs."  Cabler Decl. ¶ 48.  Thus, Boeing very plainly has a commercial interest in the information at issue here, meaning that it is the kind of

---

[3]     "The FAA consulted with EASA regarding its treatment of the comments contained in the withheld page" and "EASA clarified that the withheld page did not originate with EASA, but was instead Boeing's reformulation and description of EASA's comments," but that "if it maintained a copy of the withheld page and received a public records request for it, EASA would withhold the page in its entirety under Article 4(2) of Regulation (EC) No 1049/2001, a regulation prohibiting public access to European Parliament, Council and Commission Documents."  Cabler Decl. ¶ 39.

"commercial" information protected by Exemption 4.  *See Baker & Hostetler*, 473 F.3d at 319. Plaintiffs do not dispute this.

Plaintiffs likewise do not dispute that Boeing customarily and actually treats the information at issue as confidential.  Indeed, because of the value that this information has to the company, "Boeing limits access to such information and does not disclose it publicly, in order to prevent competitors from gaining commercial advantage by obtaining detailed technical knowledge about Boeing's products and methods of conducting certification activities."  Polland Decl. ¶ 5.  Thus, "Boeing requires its employees to follow security protocols when accessing or handling such information, including using secure IT networks to access and store it," "imposes strict limitations on the release of such information outside of the company[,]" and "submits such information to the FAA only as necessary and to the extent required to support product certification activities."  Allen Decl. ¶¶ 11-12.  Furthermore, when Boeing submitted the documents at issue to the FAA, they included formal transmittal letters containing the following notice:

> The information being forwarded to the FAA by or with this correspondence is for the exclusive purpose of support of applications for or amendments to Type Certificates, **is considered proprietary to The Boeing Company and/or its suppliers, and is provided on a confidential basis**. . . .
>
> The data provided should be returned to Boeing immediately following use by the FAA, including any copies thereof which the FAA may be required to make in the course of its review.  Boeing does not authorize the FAA to retain any portion of the materials being supplied.

Polland Decl. ¶ 30 (emphasis added).  And, the documents themselves bear proprietary markings of Boeing (e.g., "BOEING PROPRIETARY") or its suppliers, appearing, in most cases, on each page of each document.  Polland Decl. ¶ 31.  Thus there can be no dispute that Boeing customarily and actually treats this commercial information as confidential.

**B.      The Withheld Information was Obtained from a "Person."**

Exemption 4 also requires that the information be obtained from a "person," which includes information obtained from businesses.  *See e.g., Allnet Commc'n Servs., Inc. v. FCC*, 800 F. Supp. 984, 988 (D.D.C. 1992) ("'[P]erson' refers to a wide range of entities including corporations, associations and public or private organizations other than agencies.").  Here, the FAA's declarations and other supporting materials demonstrate that all of the confidential information that it has withheld was obtained "from a person" within the meaning of Exemption 4—namely, Boeing—because the FAA received this information "directly from a Boeing employee acting on behalf of Boeing."  Cabler Decl. ¶ 49.

Plaintiff argues, however, that Exemption 4 cannot apply to a handful of documents because they incorporate comments from FAA and EASA.  *See* Pls.' Mem. at 27-28.  But even government summaries or reformulations of commercial or financial information supplied by a source outside the government continue to be protected.  *Gulf & W. Indus. v. United States*, 615 F.2d 527, 529-30 (D.C. Cir. 1979) (contractor information contained in agency audit report); *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 117 F. Supp. 3d 46, 63 (D.D.C. 2015) (holding that identities of corporations were "obtained from a person," even when those names appeared in wholly intra-agency emails, because corporations' names "originated with the corporations which provided their identities to DHS in order to participate in the program"); *Judicial Watch, Inc. v. Export–Import Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000) ("[D]ocuments prepared by the federal government may be covered by Exemption 4 if they contain summaries or reformulations of information supplied by a source outside of the government.").  Indeed, "information in an agency-generated [document] is still 'obtained from a person' if such information was supplied to the agency by a person or could allow others to 'extrapolate' such information."  *S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012) (citing *Gulf & W. Indus. v.*

*United States*, 615 F.2d 527, 529–30 (D.C. Cir. 1979)).  This is true even where the particular information at issue is "arrived at through negotiation" with the government.  *Pub. Citizen Health Rsch. Grp. v. NIH*, 209 F. Supp. 2d 37, 44 (D.D.C. 2002) (concluding that although a licensee's final royalty rate was the result of negotiation with the agency, that did "not alter the fact that the licensee is the ultimate source of [the] information," inasmuch as the licensee "must provide the information in the first instance").

Here, all of the pages at issue were received directly from a Boeing employee acting on behalf of Boeing and all of the information that was redacted relating to the FAA and EASA comments consists of information that reveals the contents of Boeing's confidential information, including technical information, submitted by Boeing.  Cabler Decl. ¶ 50.  To start, the seventy-nine pages withheld in their entirety consisted of charts created through collaboration by Boeing and FAA.  Cabler Decl. ¶ 51.  These charts contained FAA comments to Boeing's project deliverables, which in themselves would reveal technical data and Boeing's proprietary methods of compliance if released.  Cabler Decl. ¶ 51.  The charts also provided Boeing's comments in response to the FAA's comments, identifying actions Boeing took to address the FAA's comments.  Cabler Decl. ¶ 51.  Of the eight pages produced with redactions, the FAA redacted only that information which originated with Boeing.  Cabler Decl. ¶ 51.  Although this information is incorporated into FAA-authored comments, these comments nonetheless reveal proprietary information originally provided to FAA by Boeing.  Cabler Decl. ¶ 51.  Finally, with respect to the page containing summaries of comments by EASA, that page was not authored by EASA, but is rather Boeing's description of EASA comments to Boeing's certification documentation, and steps that Boeing took to address these comments. Cabler Decl. ¶ 52.  Boeing's description of EASA comments as well as its descriptions of its response contain technical information that

originated from Boeing, rather than from EASA.  Cabler Decl. ¶ 52.  Thus, while the documents

may contain comments from FAA and EASA, the information that was redacted is derived from

the confidential commercial information that Boeing supplied in support of the ungrounding

process.  Accordingly, that information too was obtained from "a person"—Boeing.

C.     **Boeing Provided The Information At Issue to The Government Under Express and Implied Assurances of Privacy.**

Although the Supreme Court did not "need to resolve" whether commercial or financial

information was provided to the government under an assurance of privacy, *Argus Leader*, 139 S.

Ct. at 2366, Courts have considered the presence of such assurances when assessing whether the

withheld material is "confidential" within the meaning of Exemption 4, *see Shapiro v. Dep't of

Justice*, Civ. A. No. 12-0313 (BAH), 2020 WL 3615511, at *26 (D.D.C. July 2, 2020).  Such

assurances can be express or implied based on the circumstances.  *See Argus Leader,* 139 S. Ct. at

2363 (citing favorably the Ninth Circuit's formulation that "Exemption 4 would 'protect

information that a private individual wishes to keep confidential for his own purposes, but reveals

to the government under the express or implied promise' of confidentiality") (quoting *GSA v.

Benson*, 415 F.2d 878, 881 (9th Cir. 1969); *Besson v. Dep't of Commerce*, Civ. A. No. 18-2527

(APM), 2020 WL 4500894, at *5 (D.D.C. Aug. 5, 2020) (finding that information was supplied to

agency based on implied assurance of confidentiality); *CREW. v. Dep't of Commerce*, Civ. A. No.

18-3022 (CJN), 2020 WL 4732095, at *4 (D.D.C. Aug. 14, 2020) ("The context in which [the

company] provided [the Department of] Commerce information — to grow its business in foreign

markets — supports the notion that it did so under an implied assurance of confidentiality.").  In

this case, Boeing supplied the information at issue under both express and implied assurances of

confidentiality.  *See* Cabler Decl. ¶ 58.

"For decades, Boeing has submitted to the FAA information of the sort sought by Plaintiffs

with an understanding and expectation that the FAA would treat it as private."  Polland Decl. ¶ 23;

*see also* Cabler Decl. ¶ 62 ("[T]he FAA has a longstanding history of maintaining confidentiality

of documents that applicants provide to show compliance with FAA regulations, and ultimately

obtain a type certificate" and "historically has not released this information to the public without

the express consent of the applicant.").  Indeed, "the FAA has repeatedly made clear, in a variety

of guidance documents made available to the industry and the public, that it will protect from

public disclosure confidential information submitted by manufacturers such as Boeing in

connection with product certification activities to substantiate and demonstrate compliance."

Polland Decl. ¶ 25.  For example, FAA Order 8110.4C, *Type Certification,* provides that "[t]he

FAA must <u>not</u> release proprietary information (descriptive, design, and substantiating data

received from applicants) to any party who does not have written permission from the applicant

(or certificate holder)."  Cabler Decl. Ex. 2 at Cabler 000212.  Similarly, FAA Advisory Circular

20-179, *Certification Data Retention Agreements and Government Records,* states that:  "FAA

employees have an obligation to protect your [i.e. the Boeing's, as the applicant for certification]

proprietary data from unauthorized release."  Cabler Decl. Ex. 3 at Cabler 000302.

 In addition, Boeing and FAA offices have entered into agreements governing the handling,

retention, and protection from disclosure of Boeing proprietary and confidential data submitted to

the FAA in connection with aircraft certification and other activities.  Polland Decl. ¶ 28.  These

agreements consistently indicate that the FAA will protect such Boeing information from public

disclosure.  Polland Decl. ¶ 28.

 One such agreement is an Airworthiness Records Management Agreement (the

"Agreement") between Boeing and the FAA, dated May 24, 1982, which governs records provided

by Boeing to the FAA to support airworthiness certification such as those at issue here.  Polland

Decl. ¶ 29; Cabler Decl., Ex. 4.  That agreement distinguishes between "compliance records" (which are records that Boeing provides to the FAA for the purpose of supporting applications for airworthiness approvals) from "public airworthiness records" (which are other documents that do not contain Boeing trade secrets or competitively harmful information).  Polland Decl. ¶ 29; Cabler Decl. Ex. 4 at Cabler 000401.  Under the agreement, the so-called "public airworthiness records" may be made available by the FAA to the public, while requests for other records, such as compliance records, will be processed by the FAA in accordance with applicable laws and regulations.  Polland Decl. ¶ 29; Cabler Decl. Ex. 4 at Cabler 000401-03.  Under the process described in the agreement, Boeing submits compliance records to the FAA with formal transmittal letters describing the record and indicating the extent to which Boeing considers the record to be exempt from public disclosure.  Polland Decl. ¶ 30; Cabler Decl. Ex. 4 at Cabler 000401-02.  The FAA has agreed that it will "neither copy nor incorporate [Boeing]'s Records in FAA prepared airworthiness documents without [its] prior written permission" and that, "immediately upon the receipt of a public request for Airworthiness Approval Records, the FAA will provide [Boeing] with a copy of the request and solicit its response."  Cabler Decl. Ex. 4 at Cabler 000403-04.

Here, the documents that Boeing submitted to the FAA and which Plaintiffs seek are compliance records as described in the Agreement.  Polland Decl. ¶ 29.  Consistent with the Agreement, and as previously noted above, Boeing submitted the documents at issue, which bear proprietary markings, with formal transmittal letters notifying the FAA that the material "is considered proprietary to The Boeing Company and/or its suppliers, and is provided on a confidential basis" and that "[t]he data provided should be returned to Boeing immediately following use by the FAA[.]"  Polland Decl. ¶¶ 30-31.  Thus, "when Boeing submitted the information at issue it relied on its longstanding understanding – based on past practices, the FAA's

- 21 -

guidance, the Airworthiness Records Management Agreement, the notices contained on the transmittal letters, and the disclaimers on the submissions themselves – that the FAA would treat such information as private."  Polland Decl. ¶ 33.  And "[a]t no time did any FAA official or employee ever indicate to Boeing that the information at issue here would not be protected from public disclosure in accordance with past practices, the FAA's guidance, the Airworthiness Records Management Agreement, the notices contained on the transmittal letters, or the disclaimers on the submissions themselves."  Polland Decl. ¶ 32.

Thus, in view of the foregoing, the information at issue was plainly disclosed to the FAA under both express and implied assurances that the FAA would keep the information private.  *See CREW*, 2020 WL 4732095, at *4 (holding that information provided to government agency under implied assurance of confidentiality because, without such an assurance, the sensitive information "could easily fall into the hands of competitors or other entities that sought it").

**D.    Plaintiffs' Contention That Exemption 4 Does Not Apply to the Disputed Categories of Information Because Boeing Could Not Have Provided That Information Under An Assurance of Privacy is Without Merit.**

Plaintiffs do not dispute that the information being withheld includes commercial information that Boeing customarily and actually treats as private.  Rather, the main thrust of Plaintiffs' Motion is their contention that Exemption 4 does not apply to the disputed categories of information because, in their view, Boeing could not have provided this information to the FAA under any assurances of privacy.  *See* Pls.' Mem. at 26.  For their argument, Plaintiffs simply point to a handful of general statements made by Boeing executives and FAA officials in which those individuals made general commitments to transparency in the process to unground the 737 MAX.  *See* Pls.' Mem. at 14-16.  Plaintiffs do not, however, identify any statements in which these executives and officials committed to releasing any specific document or any particular piece of confidential information.  Nevertheless, Plaintiffs proceed to argue that, given these general

pledges of transparency, Boeing could not have provided the disputed information to the FAA under any express or implied assurances of privacy because those categories are, in Plaintiffs' view, important to understanding the certification process.  *See* Pls.' Mot. at 16-24.  Plaintiffs' arguments are without merit.

First, as an initial matter, Plaintiffs cite no binding legal authority for their contention that Exemption 4 applies *only* when information has been provided with an assurance of privacy. Indeed, nothing in the statute expressly requires such an assurance in every case.  *See* 5 U.S.C. 552(b)(4).  Rather, the key consideration in evaluating the application of Exemption 4 is "confidential[ity]."  In *Argus Leader*, the Supreme Court held that the term "confidential," as it is used in Exemption 4, must be given its "ordinary, contemporary, common meaning" at the time the statute was enacted in 1966 and that "[t]he term 'confidential' meant then, as it does now, 'private' or 'secret.'"  139 S. Ct. at 2362-63 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  The Court observed that "FOIA expressly recognizes that 'important interests [are] served by [its] exemptions,' . . . and '[t]hose exemptions are as much part of [FOIA's] purpose[s and policies] as the [statute's disclosure] requirements.'. . . So just as we cannot properly *expand* Exemption 4 beyond what its terms permit, we cannot arbitrarily *constrict* it either by adding limitations found nowhere in its terms."  *Argus Leader*, 139 S. Ct. at 2366 (citations omitted, alterations and emphasis in original).

In *Argus Leader*, the Supreme Court held that, to qualify as "confidential," the submitter must customarily and actually keep the information private, or at least keep it closely held.  *See id.* at 2363.  As the Court explained, it would be "hard to see how information could be deemed confidential if its owner shares it freely."  *Id.*  The Court further questioned whether, in some instances, it might be possible for "privately held information [to] *lose* its confidential character

for purposes of Exemption 4 if it's communicated to the government without assurances that the government will keep it private[.]"  *Id.* at 2363 (emphasis in original).  But, the Court had no need to resolve that question because it was clear in that case that such assurances had been made.  *Id.*  To date, the FAA is unaware of any Court that has attempted to answer the question posed by the Supreme Court.  Indeed, it appears that, in the cases that have been decided since *Argus Leader*, the courts have either held that the information was protected under Exemption 4, finding that the information was customarily treated as private and provided to the government under assurances of privacy, or that the information was not protected by Exemption 4 because the information was not customarily treated as confidential.  None, however, have held that the absence of an assurance of privacy is, in and of itself, sufficient to defeat an Exemption 4 assertion.[4]

As it turns out, however, nothing in the statute's text or history suggests that, for information that is typically treated as confidential by its owner, the government must in each instance show that it made assurances of confidentiality in order to establish that the information would be exempt.  For example, the House and Senate Reports that accompanied FOIA's enactment explained that Exemption 4 generally exempts information "if it would not customarily be made public by the person from whom it was obtained by the Government."  H.R. Rep. 89-1497, at 10; *accord* S. Rep. 89-813, at 9.  Thus, the way a particular type of information is typically

---

[4]         The two cases that Plaintiff relies on—*Center for Investigative Reporting v. U.S. Customs & Border Protection*, 436 F. Supp. 3d 90 (D.D.C. 2019) and *Center for Investigative Reporting v. Department of Labor*, Civ. A. No. 19-5603, 2020 WL 3639646 (N.D. Cal. Jul. 6, 2020)—are inapposite.  First, as Plaintiffs note in their brief, in both of those cases Exemption 4 did not apply because the agencies had not demonstrated that they customarily and actually treated the information at issue as confidential.  *See* Pls.' Mem. at 25-26.  Moreover, unlike *Center for Investigative Reporting v. U.S. Customs & Border Protection*, in this case, there is ample evidence that express and implied assurances had been given to Boeing.  *See supra* Section I.C.  And unlike in *Center for Investigative Reporting v. Department of Labor*, FAA had never previously indicated that it would disseminate or disclose the confidential, commercial information contained in Boeing's certification documents—quite the opposite.  Polland Decl. ¶¶ 32-33.

treated by its owner usually suffices to settle the inquiry.  The House Report explains that, in addition to the foregoing, the exemption "would *also* include information which is given to an agency in confidence, since a citizen must be able to confide in his Government."  H.R. Rep. 89-1497, at 10 (emphasis added).  That is because "where the Government has obligated itself in good faith not to disclose documents or information which it receives, it should be able to honor such obligations."  *Id.*  Thus, it is generally enough to show that information is both customarily and actually treated as private by its owner.  *See Argus Leader*, 139 S. Ct. at 2363.  If, however, in a particular context there was reason to expect that the government would disclose the information, express or implied assurances of privacy might be necessary to establish that the information has not lost its "confidential" character and still falls within the Exemption.

Here, there was no reason for Boeing to expect that the FAA would disclose any of the information in dispute.  As noted above, it had long been the practice that the FAA treated Boeing certification information confidentially.  Nor had anyone at the FAA indicated to Boeing that they intended to release this information.  Nevertheless, Plaintiffs suggest that, because FAA officials made a handful of generalized statements about transparency, that Boeing must have known that Boeing's confidential information would be disclosed.  Not so.

"It is within the FAA's Congressionally-mandated authority to make determinations on aircraft certification and airworthiness" and the FAA has worked to ensure that the type of accidents that occurred in Indonesia and Ethiopia do not occur again.  Decl. of Earl Lawrence ("Lawrence Declaration") ¶ 7.  "The FAA's review of the actions needed to return the 737 MAX to service has been thorough, deliberate and in accordance with applicable regulations and policies."  Lawrence Decl. ¶ 8.  The FAA has, indeed, emphasized the significance of transparency regarding the 737 MAX return to service, to the extent the law permits.  Lawrence Decl. ¶ 9.

Throughout the FAA's review of the 737 MAX design change, the FAA has remained transparent with congress, the public, and international partners in various ways. *See* Lawrence Decl. ¶ 9. However, in an effort to be transparent, the FAA has not endeavored to release the proprietary business information that Boeing shared with the FAA during the return to service process. *See* Lawrence Decl. ¶ 9. For example, the FAA issued a lengthy report providing a technical review of the 737 MAX and the Agency's evaluation of design changes to the aircraft, and did so "without disclosing the proprietary and commercially sensitive information about Boeing's products and processes." Polland Decl. ¶ 36. Furthermore, the FAA's statements regarding the importance of transparency was "not a commitment or indication by the FAA that it intends to release Boeing's proprietary certification documents, or information within these documents, to the public beyond what is necessary to document and explain changes to the 737 MAX before it is returned to service." *See* Lawrence Decl. ¶ 13.

From Boeing's perspective, all of the FAA's actions were "consistent with public transparency, and are the types of actions that the FAA could reasonably be expected to take," yet "[n]one of them [] negate[d] Boeing's understanding that its proprietary and confidential data submitted to support certification activities would be kept private by the FAA." Polland Decl. ¶ 37. Boeing is likewise aware of the FAA's comments, but it did not perceive anything in those statements to "suggest[] that the FAA would treat the specific types of proprietary and commercially sensitive information sought by Plaintiffs as anything other than private, and at no time did Boeing understand the FAA's statements to suggest that the FAA might disclose such information to the public." Polland Decl. ¶ 35. If it had, "Boeing would have noted this unusual departure from well-established and understood practices and raised the issue with the FAA," but "Boeing did not do so because the FAA never indicated that it would treat the information sought

by the Plaintiffs any differently."  Polland Decl. ¶ 34.  In short, "Boeing had no reason to believe, and did not believe, that the FAA's commitment to transparency meant that the Agency would treat Boeing's Proprietary and confidential information any differently than it has treated similar information in the past."  Polland Decl. ¶ 39.  Thus, in light of the foregoing, there is simply no basis to conclude that any generalized statements about transparency in any way suggested to Boeing or anyone else that the FAA committed or intended to reveal the specific information that Plaintiffs' seek or any of Boeing's proprietary information generally. As such, because Boeing customarily and actually treats this information as confidential and provided it to the FAA with the understanding that it would remain private, that information is squarely within the meaning of the term "confidential" for purposes of Exemption 4. *See Argus Leader*, 139 S. Ct. at 2366 ("At least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4.").

Lastly, Plaintiffs appear to argue that this Court should order the disclosure of Boeing's confidential, commercial information because they view it to be "significan[t]" or "importan[t]" or otherwise believe that disclosure would be in the "public interest."  Pls.' Mem. at 17-19, 26. But, as this Court has previously recognized, "once the district court concludes that the agency has established the applicability of the exemption, its inquiry is at an end; the proponent of disclosure is not free to 'bolster the case for disclosure by claiming an additional public benefit.'"  *Skybridge Spectrum Found. v. FCC*, 842 F. Supp. 2d 65, 82 (D.D.C. 2012).  In other words, "Exemption 4 embodies a congressional determination that public disclosure of confidential commercial information *does* outweigh the public interest in disclosure, and it is not the district court's role to second-guess that judgment on a case-by-case basis."  *Id.*  (emphasis in original).

**E.**   **Disclosure of Boeing's Confidential Commercial Information Would Lead to Foreseeable Harm to Boeing's Commercial Interests and Would Interfere with the FAA's ability to obtain Necessary Safety Information.**

Under the FOIA Improvement Act, an agency is permitted to withhold information if "(I) the agency reasonably foresees that disclosure would harm an interest protected by [a FOIA] exemption; or (II) disclosure is prohibited by law[.]"   5 U.S.C. § 552(a)(8)(A).   "The FOIA Improvement Act's 'foreseeable harm' requirement replaces to some extent the 'substantial competitive harm' test that the Supreme Court overruled in [*Argus Leader*]."[5]   *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 113 (D.D.C. 2019). Here, as noted in the various declarations, release of the information that Plaintiffs seek would have serious repercussions for both Boeing and for the FAA.

"[O]ne of the primary reasons Boeing limits access to such information and does not disclose it publicly is to prevent competitors from benefiting from Boeing's technical data and methods of conducting certification activities."   Allen Decl. ¶ 18.   "The market for Boeing's products is highly competitive, and new aircraft often require years and hundreds of millions of dollars to develop."   Decl. of Jeffery Allen ¶ 18.   "A large part of Boeing's historical success has been its ability to maintain an 'innovation edge' over competitors, which would be undermined by the public disclosure of the information at issue here."   Allen Decl. ¶ 18.   Thus, "[i]f the FAA were to release the confidential and proprietary information sought by Plaintiffs, the commercial harm to Boeing's competitive position would be both foreseeable and palpable."   Allen Decl. ¶ 19.   "The information would provide competitors with direct insight into Boeing's approaches and methods used in the design, testing, and certification of its products" and "would undermine Boeing's

---

[5]   *Argus Leader* "addressed a claim that arose prior to the enactment of the FOIA Improvement Act, and thus the Supreme Court had no opportunity to consider the foreseeable-harm requirement."   *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113.

competitive position by allowing competitors access to ideas, design details, certification methods, and testing processes that they would not have had or would have had to research and develop on their own."  Allen Decl. ¶ 19; *see also* Cabler Decl. ¶ 64.

But disclosure would also be harmful to the interests of the government and the mission of the FAA.  "Aviation safety depends on the free flow of information, and the FAA's access to this data is essential to its certification and oversight processes."  Cabler Decl. ¶ 65; *see also* Lawrence Decl. ¶ 12.  It is "impossible for the FAA to conduct a thorough review of the initial type certificate application, or later applications for design changes, without access to a manufacturer's confidential proprietary information."  Lawrence Decl. ¶ 12.  "If the FAA were not able to protect manufacturers' and operators' confidential proprietary information from disclosure, those companies would be reluctant to share such information" and that reluctance "would have a detrimental effect on aviation safety and innovation."  Lawrence Decl. ¶ 12.  Thus, "[a]pplicants seeking FAA approvals need to have confidence that by providing their trade secrets to the FAA to support the FAA's evaluation of a particular aircraft's safety and airworthiness, the FAA is not also releasing these documents to competitors." Cabler Decl. ¶ 65.  This is a palpable interest. Indeed, the Supreme Court emphasized Exemption 4's importance in safeguarding the government's interests by "providing private parties with sufficient assurances about the treatment of their proprietary information so they will cooperate in federal programs and supply the government with information vital to its work."  *Argus Leader*, 139 S. Ct. at 2366.  Yet, "disclosure of the type of proprietary information FlyersRights insists that the FAA release would have a certain and predictable chilling effect on the willingness of manufacturers and operators throughout the aviation industry to share information openly with the FAA," which would "impede

FAA's ability to conduct rigorous oversight and almost certainly impair aviation safety." Lawrence Decl. ¶ 17.

In light of the predictable and foreseeable harm that disclosure would inflict on both Boeing and the FAA, the FAA's withholding of information under Exemption 4 is appropriate. *Ctr. for Investigative Reporting*, 436 F. Supp. 3d at 113 (invocation of Exemption 4 is appropriate where disclosure of withheld information would "caus[e] 'genuine harm to [the submitter's] economic or business interests,' and thereby dissuad[e] others from submitting similar information to the government" (quoting *Argus Leader,* 139 S. Ct. at 2369 and citing *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765, 768 (D.C. Cir. 1974)).

## II.    THE FAA RELEASED ALL REASONABLY SEGREGABLE INFORMATION.

If a responsive record contains information exempt from disclosure, any "reasonably segregable" nonexempt information must be disclosed.  5 U.S.C. § 552(b).  Nonexempt portions of records need not be disclosed, however, if they are "inextricably intertwined with exempt portions." *Mead Data*, 566 F.2d at 260.  To establish that all reasonably segregable, nonexempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Off. of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Justice*, 567 F. Supp. 2d 104, 110 (D.D.C. 2008).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester.  *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007).

Here, FAA examined and processed all of the records responsive to FlyersRights's requests in order to determine whether any information they contained could be released.  *See* Cabler Decl. ¶¶ 66-68.  Where exempt information was reasonably segregable from nonexempt information,

the Agency redacted only the exempt information and produced the rest.  *See* Cabler Decl. ¶¶ 66-68; Allen Decl. ¶¶ 15-18.  Therefore, all reasonably segregable information has been released and the FAA is entitled to summary judgment.

## CONCLUSION

For the reasons stated above, Defendant respectfully requests that this Court grant Defendant's Cross-Motion for Summary Judgment.

Dated: November 18, 2020                             Respectfully submitted,


                                                     MICHAEL R. SHERWIN
                                                     Acting United States Attorney

                                                     DANIEL F. VAN HORN, D.C. Bar #924092
                                                     Chief, Civil Division


                                                     By: */s/ Derek S. Hammond*_____
                                                           DEREK S. HAMMOND
                                                           D.C. Bar #1017784
                                                           Assistant United States Attorney
                                                           555 Fourth Street, NW
                                                           Washington, DC 20530
                                                           202-252-2511
                                                           Derek.hammond@usdoj.gov

                                                     *Attorneys for the United States of America*