UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| FLYERS RIGHTS EDUCATION FUND, INC., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 19-cv- 3749 (CKK) |
| FEDERAL AVIATION ADMINISTRATION, | ) ) | |
| Defendant. | ) ) ) ) | |

---

**COMBINED MEMORANDUM OF POINTS AND AUTHORITIES
OF PLAINTIFF IN REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S
CROSS-MOTION FOR SUMMARY JUDGMENT**

This Memorandum is filed by Plaintiff Flyers Rights Education Fund, Inc. ("FlyersRights") in reply to Defendant Federal Aviation Administration's Opposition (Doc. No. 23-4) to Plaintiff's Motion for Summary Judgment (Doc. No  21); and in opposition to the FAA's Cross-Motion for Summary Judgment (Doc No. 23).

On the very day that the FAA filed its Cross-Motion and Opposition,  the FAA issued an order ungrounding the 737 MAX aircraft, two of which had crashed within a period of five months, resulting in the deaths of 346 passengers and crew members.  FAA, *Notification of Rescission of Emergency Order of Prohibition*, 85 Fed. Reg. 74260 (Nov. 20, 2020). Simultaneously, the FAA issued a final Airworthiness Directive, finding the 737 MAX fit and safe to operate again based on design changes proposed to the agency by The Boeing Company, the aircraft's manufacturer. FAA, *AD-2020-24-02, Airworthiness Directives: The Boeing Company Airplanes, Final Rule*, 85 Fed. Reg. 74560 (Nov. 20, 2020)(the "Final AD").  Additionally, the agency issued a final version

of its Summary of the FAA's Review of the Boeing 737 Max (Nov 18, 2020)(attached hereto as Ex. 1)(the "Final Summary of FAA Review").

The Final AD and Final Summary describe in some detail the nature of the design changes the FAA found sufficient to allow the 737 MAX to fly again.  Despite their length, what those documents do *not* disclose is precisely *why and how* FAA concluded that these fixes are adequate. What Plaintiff seeks are not the proprietary details of Boeing's designs, but specifically, what plans Boeing submitted and followed for showing how its proposed fixes would work; specific criteria applied by the FAA to find the aircraft now compliant with FAA requirements, criteria that Boeing was allowed to make up itself; the specific nature of the safety and flight tests conducted; the results of those tests; and the FAA's own comments on Boeing's proposed fixes.  These are the Disputed Information Categories that FlyersRights contends are not protected from public disclosure by Exemption 4 and must be disclosed.

At the heart of this dispute is the fundamental inconsistency between the FAA's insistence that it gave Boeing an assurance these materials would be kept secret from the public, and the FAA's repeated assurance to the public that the agency would be completely transparent with the public in the process of certifying that the 737 MAX would be safe to fly again.  The significance of the transparency pledge arises from the FAA's past conduct with respect to this very same aircraft.  The agency went through this same process it says the public should now trust, in certifying the 737 MAX as safe in March 2017—a mere twenty months before the first crash of the aircraft (Lion Air Flight JT610), killing all 189 passengers and crew. Independent studies since have placed a large part of the blame on Boeing's secrecy and concealment. To show Congress and the public that the same mistakes will not be made again, the FAA has strongly and repeatedly emphasized its commitment to full transparency this time.

Boeing was fully aware of that commitment. And that commitment is completely meaningless without public disclosure of the Disputed Information Categories.

None of the arguments advanced by the FAA justifies invoking Exemption 4 to block such disclosure. *First,* the 79 pages of FAA's own comments on Boeing's submissions were not "obtained from a person" within the meaning of Exemption 4. They consist entirely, or largely, of the agency's own words, and must be disclosed.

*Second*, the agency has failed to show that Boeing provided the documents at issue under any express or implied assurance of privacy. At a minimum, Exemption 4 does not apply when the agency has affirmatively indicated that information will be disclosed. The written documents cited by the FAA do not provide any express assurance of privacy, which would be inconsistent with the agency's past practice in these circumstances. And the implication of any such assurance was defeated by the FAA's own statements about transparency, given the history and context of those statements and the fact that it is not possible to achieve such transparency without disclosure of the Disputed Information Categories.

*Third,* the FAA's explanation of the "means of compliance" that it insists on withholding under Exemption 4 demonstrates that this information is effectively a body of secret law which is never entitled to be withheld under FOIA.

*Fourth,* the FAA's own characterization of the Disputed Information Categories indicates that the proprietary information as to which Boeing has claimed confidentiality fails to demonstrate that such proprietary information cannot be reasonably segregated from the Disputed Information Categories such that the latter can be released.

*Finally,* the FOIA Improvement Act imposes an additional requirement for withholding—a showing of harm to an interest protected by an exemption – not as a substitute for meeting the requirements of the exemption, in this case, the *Food Marketing Institute* test. The FAA has failed to show that the information it seeks to withhold meets that test.

## I.     THE FAA COMMENTS WERE NOT "OBTAINED FROM A PERSON"

The FAA concedes that it has withheld in full 79 pages of "records that contain FAA comments to Boeing certification documents." Combined Memorandum of Points and Authorities In Support of Defendant's Cross-Motion  for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment, Doc. No. 23-4 ("Def. Mem.") at 13.  The FAA cannot and does not dispute that "[i]nformation 'generated within the Government' is not "obtained from a person" and, thus, does not fall under the exemption."  *Center for Auto Safety v. U.S. Dep't of Treasury*, 133 F. Supp. 3d 109, 120 (D.D.C. 2015) (quoting *Bd. of Trade v. Commodity Futures Trading Comm'n*, 627 F.2d 392, 404 (D.C. Cir. 1980), *abrogated on other grounds, U.S. Dep't of State v. Wash. Post Co*., 456 U.S. 595 (1982)). Nevertheless, the agency contends that the FAA comments were "obtained from a person" because they contain information that "reveals the contents of Boeing's confidential information, including technical information submitted by Boeing." Def. Mem.  at 18.

That contention does not withstand scrutiny.  According to the Deputy Director of the FAA's Aircraft Certification Service, the withheld portions of the FAA comments contain FAA's "comments and discussion detailing very specific failure conditions with the proposed analyses" and the "questions FAA asked to ensure that the analyses supported compliance," including comments that "describe and ask questions about Boeing's technical data and methods of compliance."  Declaration of Susan Cabler, Doc. No. 23-5 ("Cabler Decl.) ¶36.  Specifically the

79 pages withheld in their entirety consisted of "charts which provided *FAA's comments to earlier versions of the project deliverable* to which they were attached, note Boeing's position with respect to those comment and summarize changes that Boeing made to accommodate the FAA's comments." *Id*. ¶37 (emphasis added). In other words, the agency withheld extensive comments, discussion and questions *created entirely by the FAA* itself, on the grounds that that agency-created material refers to Boeing's proprietary technical information.

Such agency-created material is not "obtained from a person" merely because it refers to material created by an outside entity. "[W]hen the redacted information—despite relying upon other information obtained from outside the agency—constitutes that agency's own analysis, such information is the agency's information and not 'obtained from a person" under Exemption 4." *Southern Alliance for Clean Energy v. U.S. Dep't  of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012). The "key distinction…is between information that is either repeated verbatim or slightly modified by the agency, and information that is substantially reformulated by the agency. . . ." *Id*.

Thus, in *Center for Auto Safety v. U.S. Dep't of Treasury*, Treasury withheld email communications relating to the General Motors and Chrysler bankruptcies, consisting of emails and attachments between Treasury and those companies. Many of the emails were from Treasury. Treasury argued that was irrelevant because the emails contained  confidential information originally provided by GM or Chrysler, including "responses from Treasury that would otherwise reveal the content of the GM or Chrysler communications. " *Center for Auto Safety*, 133 F. Supp. 3d at 126. The Court disagreed. It found that the lack of information about actual authorship— which it regarded as the key factor –in the *Vaughn* index was insufficient because it was not possible to determine who actually authored the emails. "[F]or many of the disputed documents, without more information about the authors, the court cannot determine whether the documents

contain information 'obtained from a person' rather than information generated within Treasury." *Id*. at 124. The Court ordered a new *Vaughn* index to "enable a ruling on whether each specific contested piece of information was 'obtained from a person.'" *Id*. at 127.

Here, fortunately, the *Vaughn* Index and the Cabler Declaration  are sufficient to resolve the issue. They make clear that the FAA's comments, discussion, and questions about Boeing's technical submissions consist of the *agency's own words*—not merely a verbatim repetition or slight modification of those submissions.  The agency's own words were not "obtained from a person."  They were generated by the Government.  They are not covered by Exemption 4.

## II.   THE DISPUTED INFORMATION CATEGORIES WERE NOT PROVIDED UNDER AN ASSURANCE OF PRIVACY

### A.  At a Minimum the Agency Must Show That Boeing Had No Reason to Expect It Would Disclose the Information

As the parties have discussed extensively, in *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356 (2019) the Court held that, "At least where commercial or financial information is both customarily and actually treated as private by its owner and provided to the government under an assurance of privacy, the information is 'confidential' within the meaning of Exemption 4."  *Id.* at 2366. The Court found it unnecessary to decide whether the second condition, assurance of privacy, has to be met in every case because it was in fact met in the case before the Court.

The FAA contends that there is "no binding legal authority for [Plaintiff's] contention that Exemption 4 applies *only* when information has been provided with an assurance of privacy." Def. Mem. at 23 (emphasis in original). To be sure, the courts that have addressed the issue have not found it necessary to decide that issue squarely because in every case they have either assumed an assurance of privacy *was* a requirement, found that this condition had been met, or found it highly

6

relevant even if not an express requirement. *E.g., Citizens for Responsibility & Ethics in Washington v. U.S. Dept. of Commerce*, No. 18-cv-3022 (CJN), 2020 WL 4732095 at *3 (D.D.C., Aug. 14, 2020) ("[a]ssuming that Exemption 4 can be satisfied here only if Commerce gave [plaintiff] some assurance of confidential treatment…."); *Besson v. United States Dept. of Commerce*, No. 18-cv-02527, 2020 WL 4500894 at *5  (D.D.C., Aug. 5, 2020)(test met where "context shows that the information was supplied under an implied assurance of confidentiality"); *Center for Investigative Reporting v. U.S. Customs & Border Protection*, 436 F. Supp. 3d 90, 112-113 (D.D.C. 2019) (government acknowledges it may need to show it provided assurance to submitters; given other deficiencies in government's position, no need to resolve but "defendants must supply at least some evidence that this assurance was given").  In *Stotter v. U.S. Agency for Int'l Development*, No. 14-cv-2156 (KBJ), 2020 WL 5878033 (D.D.C. Oct. 3, 2020), the Court expressly held that "it is clear beyond cavil that whether the agency provided an 'assurance of privacy' when it received the information is relevant to determining whether" information is confidential for purposes of Exemption 4.  *Id*. at *5.

In any event, at a minimum it is clear that when an agency indicates that it *will* disclose certain categories of information submitted to the agency, the *Food Marketing* test is not met. Thus, in *Center for Investigative Reporting v. U.S. Dep't of Labor*, No. 19-cv-05603-SK, 2020 WL 3639646 (N.D. Cal., July 6, 2020), the Court held that, "while it is uncertain whether an assurance of privacy is required, where, as here, [the agency] OSHA indicated the opposite—that it would disclose the [information at issue]—Amazon [the submitter] lost any claim of confidentiality it may have had." *Id.* at *15.  More recently, in *WP Co. LLC v. U.S. Small Business Adm'n*, No. 20-cv-1240 (JEB), 2020 WL 6504534 (D.D.C. Nov. 5, 2020), the Court held that even though the need to meet the "assurance of privacy" prong remains an "open question" in the D.C.

Circuit, *id*. at *6, Exemption 4 cannot apply where the agency has affirmatively indicated that the information at issue would be disclosed.  *Id*. at *9.

   As the FAA itself acknowledges, "[i]f . . . in a particular context there was reason to expect that the government would disclose the information, express or implied assurances of privacy might be necessary to establish that the information has not lost its 'confidential' character and still falls within the Exemption."  Def. Mem. at 25. In this case, there was no express assurance of privacy and there was every reason to expect the government would disclose the information.

### B.   Boeing Received No Express Assurances of Privacy from the FAA

   The FAA contends that it extended express assurances to Boeing that the agency would not release the Disputed Information Categories.  According to the FAA, the agency "has a longstanding history of maintaining confidentiality of documents that applicants provide to show compliance with FAA regulations" and "historically has not released this information to the public without the express consent of the applicant."  Cabler Decl. ¶62. *See* Def. Mem. at 19-20.

   In fact, whatever the general practice may have been, the FAA has a history of releasing Boeing's technical information, including testing plans and results, in those cases in which the company has sought re-certification following the grounding of its aircraft due to fatal or serious accidents.  In 1996, a Boeing 747-100 exploded shortly after take-off from JFK Airport killing all 230 people on board.  FlyersRights President and Co-Plaintiff Paul Hudson testified before a Presidential commission and advisory committee about the cause of the crash.  The FAA publicly disclosed the technical details of Boeing's proposed fixes and allowed them to be vetted by independent and industry experts.  Supplemental Declaration of Paul Hudson. attached hereto as Ex. 4 ("Supplemental Hudson Decl.") ¶4.

Again, in 2013, after the Boeing 787 Dreamliner was grounded due to battery fires, FlyersRights participated in the re-certification proceeding.  "In those proceedings, Boeing and the FAA, unlike here, disclosed technical details of its battery fix and the testing that went into the decision to unground the plane."  Supplemental Hudson Decl. ¶2.  Indeed, the FAA placed detailed technical information about the fixes, drawings, test plans and  detailed test results in the rulemaking docket, FAA Docket 2013-0333. See  Boeing 787 Airworthiness Limitations (April 2013),  attached hereto as Ex. 6.  Mr. Hudson's testimony is that, "To the best of my knowledge in no other ungrounding decision by the FAA after grounding an aircraft as a result of a crash causing high loss of life has the FAA or its siter agencies or even Boeing insisted on secrecy in the proposed fixes, the technical evaluations and testing."  Supplemental Hudson Decl. ¶5.

FAA further insists that it has "repeatedly made clear, in a variety of guidance documents made available to the industry and the public, that it will protect from public disclosure confidential information submitted by manufacturers."  Declaration of David Polland, Doc. No. 24-4 at ¶25. The documents cited by the FAA, however, do not provide any assurance that any information Boeing decided to stamp "confidential" would automatically be provided confidential treatment. Rather, those documents simply provide that in handling Boeing proprietary information, the agency will comply with applicable law—including FOIA.

The first document on which the agency relies, FAA Order 8110.4C, Cabler Decl. Ex. 2, actually states that the "policy for disclosure of FAA information is contained in Order 1270.1, Freedom of Information Act Program, and contains 9 exemptions for release of technical data." Cabler Decl. Ex. 2 at Cabler 000212.  FAA Order 1270.1, *Freedom of Information Act Program* (June 13, 2000), attached hereto as Ex. 2, simply lists the nine FOIA exemptions, including

Exemption 4.  Ex. 2 hereto at 17-18. There is no assurance of privacy for any technical or proprietary information not subject to Exemption 4 under otherwise applicable legal standards.

Similarly, FAA Advisory  Circular 20-179, Certification Data Retention Agreements and Government Records, Cabler Decl. Ex. 3, provides, after the portion quoted by the FAA, that "Some of the circumstances in which the FAA can release proprietary data to the public" include when the "requestor of the proprietary data can cite a statute, a bilateral agreement or a written order from a higher governmental authority directing the FAA to release that proprietary data." Calber Decl. Ex. 3 at Cabler 000302-000303. Of course, in this case, the requestor  can cite such a statute—the FOIA. Nothing in this Circular suggests that the agency has given any express assurance of privacy to any document otherwise releasable under FOIA.

Finally the FAA cites an eighteen-year old agreement  between the FAA and Boeing establishing procedures for records submitted by Boeing to the agency in airworthiness certification proceedings.  Agreement between FAA and The Boeing Company, Cabler Decl. Ex. 4. The Agreement actually distinguishes between "Compliance Records" and "Public Airworthiness Records," with the latter defined to include "documents obtained or created during an airworthiness approval project for the purpose of substantiating the FAA's decision making process for that project." *Id*. at Cabler 00401.  No trade secret or "competitively harmful data" are to be included in these  documents, which are to be made "routinely available be to the public." *Id*.

To the extent the Disputed Information Categories are reasonably segregable from "competitively harmful data," see section IV below, this Agreement if anything actually requires their public disclosure, rather than prohibiting it.  In any event, as to both categories of documents, section 7 of the Agreement provides that, "Immediately upon the receipt of a public request for

Airworthiness Approval Record, the FAA will provide Applicant with a copy of the request and solicit its response.  FAA will process the public request strictly in accordance with applicable Federal Statutes and regulations."  *Id*. at Cabler 00402-00403. Again, there is no assurance of anything other than that information submitted by Boeing will be processed in accordance with the requirements of FOIA.

For these reasons, there was no express assurance given to Boeing that its submissions would be treated as private if they are otherwise subject to disclosure under FOIA.

### C.  The Agency Effectively Told the Public and Boeing That the Agency Would Disclose the Disputed Information Categories

As explained in detail in the Plaintiff's Memorandum in Support of Summary Judgment, both FAA and Boeing officials have repeatedly pledged complete transparency with respect to the re-certification of the 737 MAX as "airworthy," *i.e.,* safe to fly. Despite these commitments being made by the Administrator under oath to Congress, and by the Administrator and other agency and Boeing officials to the public, the agency now characterizes these pledges as a mere "handful of general statements… in which those individuals made general commitments to transparency in the process to unground the 737 MAX."  Def. Mem. at 22.

That posture is not defensible.  Inherently in this context "transparency" must mean exposing the specific steps taken, the tests and analyses conducted and the results of those tests and analyses, that support the agency's decision.  Boeing must have expected the agency to release that much. This is a situation in which, because the agency affirmatively indicated "that it would disclose" the information at issue, the submitter " lost any claim of confidentiality it may have had." *Center for Investigative Reporting*, 2020 WL 3639646  at *15.

As the FAA itself concedes, the issue is whether "in a particular context there was reason to expect that the government would disclose the information." Def. Mem. at 25.  Here the context

is the history giving rise to the pledge of transparency. The FAA went through this same process that it says the public should now trust, in certifying the 737 MAX as safe in March 2017—a mere twenty months before the first crash of the aircraft (Lion Air Flight JT610), killing all 189 passengers and crew. Extensive studies including studies commissioned by the FAA itself, have harshly criticized the process followed by the FAA in its original certification of this aircraft, including delegating many of its functions to Boeing.. *See generally*, *Boeing 737 MAX Flight Control System: Joint Authorities Technical Review: Observations Findings and Recommendations* :III-XIII (Oct. 2019) https://www.faa.gov/news/media/attachments/Final_JATR_Submittal_to_FAA_Oct_2019.pdf (last visited Nov. 22, 2020).

Independent studies have placed a large part of the blame on Boeing's practice of secrecy and concealment. For example, a report by the Majority Staff of the U.S. House Committee on Transportation and Infrastructure concluded that one of the fundamental problems in the original certification was Boeing's "Culture of Concealment" leading Boeing to withhold "crucial information from the FAA, its customers and 737 MAX pilots.*" Final Committee Report, The Design, Development and Certification of the Boeing 737 Max* 12-13 (Sept. 2020), https://transportation.house.gov/imo/media/doc/2020.09.15%20FINAL%20737%20MAX%20Report%20for%20Public%20Release.pdf (last visited Nov. 23, 2020).

To show Congress and the public that the same mistakes will not be made again, the FAA has strongly and repeatedly emphasized its commitment to full transparency this time.  As the FAA Administrator told Congress a year ago, "The FAA both welcomes and invites scrutiny of our processes and procedures. . .  We believe that transparency, open and honest communication, and our willingness to improve our systems and processes are the keys to restoring public trust in the

FAA and the safety of the 737 MAX." *The Boeing 737 MAX: Examining the Federal Aviation Administration's Oversight of the Aircraft's Certification: Hearing before the House Comm. on Transportation & Infrastructure,* 116th Cong. 14  (2019).

This commitment to transparency is not mere boilerplate or "generalized statements" as FAA would have it.  Def. Mem. at 22.  It is a very serious pledge that has been taken seriously by Congress and the public. And Congress and public have understood it to mean the agency absolutely would disclose precisely the information in the Disputed Information Categories.

The Chair of the House Transportation Committee and its Aviation Subcommittee wrote to the FAA Administrator on October 1, 2020, citing the agency's history of concealment, noting that "unfortunately the FAA has not always been fully forthcoming with the public regarding the rationale for its decision. . . . In addition the Committee's investigation revealed several instances where fuller disclosure by Boeing to both the FAA and to its 737 MAX customers and pilots may have dramatically improved the safety of the aircraft, ….The FAA must take maximum efforts to be transparent with the public about its ungrounding decision."  Pl. Mem. in Support of Motion for Summary Judgment, Ex. 1. Doc. 21-3. The lawmakers urged public release of "all documents related to design revisions or evaluations related to the aircraft's safe return to service"  and stated that the "FAA needs to be transparent… and it should fully reveal the data any determination to unground the MAX has been based upon." *Id.*

On October 29, 2020, hundreds of family members and friends of the passengers who perished in the second 737 MAX crash (Ethiopian Airlines Flight 302), wrote to the FAA Administrator, asking for release of this information.  Letter from Families and Friends to Elaine Chao and Stephen Dickson, Oct. 28, 2020 (attached hereto as Ex. 5).   The families and friends

noted that the agency's prior assurances that the MAX was safe to fly turned out to be absolutely false, tragically so, and stated that:

> Now once again, your agency says that the Boeing 737 MAX is safe to fly.  Yet the documents, tests and information upon which you relied to make this determination are being held secret by the FAA.  The FAA's NPRM presents conclusions and general information, but does not contain technical descriptions of the fixes or other information which the families the public or outside experts can use to examine whether your conclusions are true or reasonable…. Claims of transparency do not substitute for actual transparency.  . . . Before you make a decision on whether to unground the MAX, we demand that you release the protocols, technical descriptions of the changes, test data or other important technical information that you relied upon to determine that the MAX is safe.

*Id*.

The stakes for such disclosure were raised just a few days ago when the basis for public confidence in FAA's ungrounding was shaken by the decision of the European Union Aviation Safety Agency not to adopt the Final AD and to keep the aircraft grounded in Europe until EASA can issue its own directive.  EASA Decision (Nov. 20, 2020), attached hereto as Ex. 3.

The FAA's commitment to transparency is completely meaningless without public disclosure of the Disputed Information Categories.  According to the FAA, Plaintiff is merely suggesting that the Disputed Information Categories "are, in Plaintiffs' view, important to understanding the certification process."  Def. Mem. at 23.  That is a fundamental mischaracterization of Plaintiff's position.

In his Declaration submitted by the FAA with their opposition, the FAA's Director of the Aircraft Certification Service avers that the "FAA's statements regarding the importance of transparency  were not a commitment or indication by the FAA that it intends to release Boeing's proprietary certification documents, or information within these documents, to the *public beyond what is necessary to document and explain changes to the 737 MAX before it is returned to servic*e."  Declaration of Earl Lawrence, Doc. 23-7 ¶13 (emphasis added).  That is precisely the

point.  The information at issue is not simply important to understanding the re-certification.  It is absolutely "necessary to document and explain" to the public why the FAA believes the changes to the aircraft made by Boeing are sufficient.  In that regard, the information is essential to enabling the public to have any confidence in the FAA's decision.

Dr. Javier de Luis, an aeronautical engineer and scientist with 30 years of experience, who has taught in the Department of Aeronautics and Astronautics at MIT, initially  reviewed both the FAA's Preliminary Summary of FAA's Review of the Boeing 737 MAX. Declaration of Javier de Luis, attached to Pl. Statement of Undisputed Material Facts as Ex 4 (Doc. 21-6).  He noted that while the FAA claims more than 4,000 hours of flight testing, the "FAA does not disclose what the test flight plans actually were or any of the specific results of the test flights.  Without such information, there is no way to confirm whether the test flight for  particular component or feature actually demonstrated that the component or feature worked properly and safely."  *Id*. ¶2.

Dr. de Luis has now reviewed the FAA's Final AD and Final Summary.  Supplemental Declaration of Javier de Luis attached hereto as Ex.7 ("de Luis Supplemental Decl.").  He explains that  none of the central findings of the FAA on which its re-certification decision is based is that "'the 737 MAX is capable of continued safe flight and landing with MCAS [Maneuvering Characteristics Augmentation System] inoperative.'"  De Luis Supplemental Decl. ¶8 (quoting Final AD,  85 Fed. Reg. at 74563). That is because one of the main new features on which the FAA's decision relies is the ability to disable the MCAS when disagreeing signals are received from the Angle of Attack sensors. *See* Final AD, 85 Fed. at 74562-74565.

According to Dr. de Luis, the "key question in evaluating the basis for the FAA's decision is, is the MAX safe to fly without MCAS?  If not, for example, if it is not stable in pitch, the aircraft would not be safe to fly, since shutting down MCAS would lead to additional unsafe conditions."

Supplemental de Luis Decl.  ¶ 10. Dr. de Luis states, however that it "is impossible for me or any other independent expert to address this question, however, without being able to review results of the actual test of the aircraft conducted with and without MCAS in operation—the information contained in the Disputed Information Categories. The whole reason for MCAS is based on compensating for the aerodynamic shortcomings of the aircraft's design… Without knowing the design and results of the tests and analyses performed, there is no way to tell whether the MCAS fixes approved by the FAA are adequate." *Id*. ¶11.

The Final AD and Final Summary have also been reviewed by Plaintiff's expert Michael Neely, an aerospace consultant who spent 20 years at Boeing as a system engineer and project engineer, has worked on Boeing commercial aircraft development programs and has direct knowledge of Boeing's engineering procedures and processes.  Supplemental Declaration of Michael Neely attached hereto as Ex.8.  ("Supplemental Neely Decl.")  Mr. Neely notes that the Final Summary indicates that a "crucial defect in the original design that contributed to the fatal crashes 'was addressed by Boeing by updating… software… and changing flight control laws laws…'" Supplemental Neely Decl. ¶6 (quoting Final Summary, Ex. 1 hereto, at 20).

Mr. Neely further notes that the Final Summary indicates that the "updated flight control system was tested and asserts in conclusory fashion that it worked."  Supplemental Neely Decl. ¶7 (citing Final Summary 40-42). "But in the 100 some pages of the Final summary, there is no actual information how this design change was concluded and tested with specific test results." *Id.* "[W]ithout the Disputed Information Categories withheld by the FAA from public disclosure in this case, . . . it is not possible for me or any other independent expert in aircraft design and safety, to determine whether the design modifications that the FAA has determined now make the 737

MAX safe to fly in fact do make it safe to fly." *Id.* ¶5. After reviewing the findings of independent

government and other reports on the defects in the 737 MAX, Mr. Neely concludes that:

> The findings from all the industry and U.S. government reports have not been proven mitigated by Boeing or the FAA to satisfy a conclusory certification of the 737 MAX return into service. Therefore, in the opinion of this consultant, it would be a RISKTO PUBLIC SAFETY if the 737 MAX was allowed into service without a thorough third party review of the require design data, safety analysis and certification data that presumably back the FAA's conclusions.

Supplemental Neely Decl. ¶11.

The public clearly understood and was led to believe that the FAA would release the data

necessary to understand how and why the FAA reached its conclusions that the design fixes now

make this aircraft safe to fly. That is the information contained in the Disputed Information

Categories, and Boeing was certainly aware of FAA's commitment. In these circumstances, the

FAA cannot claim that it provided Boeing with an implied assurance that the Disputed Information

Categories would be kept private.

### III.   MEANS OF COMPLIANCE CANNOT BE ENTITLED TO CONFIDENTIAL TREATMENT UNDER FOIA

According to FAA, "[m]eans of compliance are descriptions of how an applicant will show

compliance to applicable FAA regulations." Cabler Decl. ¶26. FAA concedes that "FAA and

some standards organizations publish means of compliance that have already been accepted, and

that applicants can choose to use these publicly available methods…." *Id.* ¶29. However, aircraft

manufacturers "often develop their own means of compliance that are specific to their airplane

design…." *Id.*

In other words, "means of compliance" are the procedures that the agency will follow to

determine whether the manufacturer's design complies with FAA regulations. Although there are

public standards published by recognized testing organizations that can be used, FAA—consistent

with its preferred practice of delegating security of the henhouse to the foxes—evidently allows

Boeing to make up its own procedures for demonstrating compliance. That in itself is surprising

given that the FAA Administrator told Congress that, in the re-certification of the 737 MAX,

"We're not delegating anything to Boeing because the expectation is that the FAA is going to use

its resources and the resources of others."  U.S. House Committee on Transportation, *Hearing:*

*The Boeing 737 MAX: Examining the FAA's Oversight of the Aircraft's Certification*, 116th Cong.

at 1:38 (Dec. 11, 2019), https://transportation.house.gov/committee-activity/hearings/the-boeing-

737-max-examining-the-federal-aviation-administrations-oversight-of-the-aircrafts-certification

(last visited Nov. 24, 2020).

In any event, notwithstanding that Boeing is allowed to create them, those procedures are

legally binding agency policy.  They are applied by the agency to make a legally binding

determination about whether a particular design complies with FAA regulations.   Inherently

such a set of procedures cannot be withheld under FOIA.

It is a bedrock principle of FOIA that "an agency is not permitted to develop a 'body of

"secret law," used by it in the discharge of its regulatory duties, . . . but hidden behind a veil of

privilege…'"  *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014).

"Therefore an agency must disclose 'binding agency opinions and interpretations' that the agency

'actually applies in cases before it.'"  *Id.* (quoting *Schlefer v. United States*, 702 F.2d 233, 244

(D.C. Cir. 1983)(internal quotation omitted). Thus, in *Sterling Drug, Inc. v. FTC*, 450 F.2d 698

(D.C. Cir. 1971), the Court ordered disclosure under FOIA of memoranda prepared by FTC staff

setting out orders and interpretations that the agency actually applied to a case before it.  "These

are not the ideas and theories which go into the making of the law, they are the law itself, and as

such should be made available to the public. Thus, to prevent the development of secret law within

the Commission, we must require it to disclose orders and interpretations which it actually applies in cases before it." *Sterling Drug*, 450 F.2d at 709.  Although these cases were decided in connection with application of Exemption 5, the ban on secret law logically should apply in the case of any exemption.

The specific procedures for determining compliance with FAA regulations are binding rules that are applied in certification proceedings before the agency.  They are "the law itself;" if you show this design feature meets test x, y and z, then we will find it complies with our regulations, as a matter of law. The FAA cannot withhold its internal binding law under any exemption of FOIA.  The means of compliance should be ordered disclosed.

## IV.   THE FAA HAS FAILED TO SHOW THAT CERTAIN DISPUTED INFORMATION CATEGORIES ARE NOT REASONABLY SEGREGABLE FROM BOEING'S PROPRIETARY TECHNICAL INFORMATION

Apart from the FAA's own comments, the Disputed Information Categories consist of certification plans, testing methods, plans and conditions; means of compliance; flight test plans and criteria; flight test results; and safety analyses.   See Pl. Mem. in Support of Summary Judgment, Doc. 21-1 at 9-10. The FAA asserts that "all reasonably segregable information has been released."  Def. Mem. at 31.

According to the FAA's description of the information it has withheld, however, it is apparent that the agency has not shown that it would be unable reasonably to segregate the information Plaintiff is seeking from Boeing's proprietary technical information.  For example, Plaintiff  is seeking flight test plans and criteria that would address some very basic questions: What was going to take place in a test flight and what was supposed to be shown? What maneuvers would the pilot attempt?  What would the pilot do to put the formerly problematic features of the

aircraft through their paces? How long was the test? Where would the plane be flown and under what kind of weather and other conditions?

None of this information constitutes proprietary technical information—and the FAA doesn't really claim that it does. Rather, the FAA simply avers that flight test plans "are specific to a particular manufacturer's airplane design as they *contain* descriptions of the airplane's flight control systems, flight characteristics such as stability and maneuverability and the flight control laws and algorithms encoded in the flight control computer." Cabler Decl. ¶30 (emphasis added). But the fact that technical information is "contained" in these plans does not mean that the entire plan consists of such information. And it does not make sense that it would. FAA has not explained why the technical design details cannot be separated from the information that Plaintiff seeks and that the FAA necessarily pledged to disclose.

Similarly, with respect to flight test results, FAA states that the "results of an applicant's flights tests describe how their design performed and whether it met FAA requirements…" Cabler Decl. ¶32. The agency suggests that "flight test results *include* detailed technical flight test data gathered through extensive instrumentation and analyzed after the test to correlate and confirm the perceived results of any specific test." *Id.* (emphasis added). But the FAA does not claim that the test results themselves consist solely of technical details about the aircraft design or that any references to such details could not be redacted.

As to segregability generally, the FAA asserts in conclusory fashion that all of the information being withheld "is so inextricably intertwined with the technical information and the proprietary compliance information that segregation and release would result in disclosure of only partial sentences or single sentences…" Cabler Decl. ¶67.

That claim does not add up.  Again, the results of testing a design do not inherently disclose the proprietary details of the design.  The test results reveal that Feature A worked; Feature B did not work because when a certain action was taken, XYZ was the result.  There is no basis to believe such information cannot be segregated from the actual proprietary technical information, and disclosed.

The government bears the burden of demonstrating that no reasonably segregable material exists in the withheld documents. *Army Times Publ'g Co. v. Dep't of Air Force*, 998 F.2d 1067, 1068 (D.C.Cir.1993). The agency must "provide[ ] a detailed justification and not just conclusory statements to demonstrate that all reasonably segregable information has been released." *Valfells v. CIA*, 717 F.Supp.2d 110, 120 (D.D.C.2010) (internal quotation marks omitted); *see also Armstrong v. Exec. Office of the President,* 97 F.3d 575, 578 (D.C.Cir.1996).

To be sure, the agency  meet its obligation of "reasonable specificity" with "[t]he combination of the *Vaughn* index and [agency] affidavits." *Johnson v. Exec. Office for U.S. Att'ys*, 310 F.3d 771, 776 (D.C.Cir.2002). Whether the *Vaughn* index is sufficient, however,  "turns on whether the agency has sufficiently explained why there was no reasonable means of segregating factual material from the claimed privileged material." *Wilderness Soc'y v. U.S. Dep't of Interior*, 344 F.Supp.2d 1, 18 (D.D.C. 2004).  at 18. "[A] blanket declaration that all facts are so intertwined" is not sufficient to meet this burden. *Id.* at 19.  *Barouch v. U.S. Dep't of Justice*, 962 F. Supp. 2d 30, 56 (D.D.C. 2013).

In this case, it cannot be the case that there is no information at all about testing methods, plans and conditions; flight test plans and criteria; and flight test results that cannot be separated from technical proprietary details of the aircraft design, and released.  The FAA has failed to meet its burden.  That information should be released.

## V.   THE FOIA IMPROVEMENT ACT MAKES SHOWING OF PROPRIETARY HARM AN ADDITIONAL REQUIREMENT, NOT A SUBSTITUTE FOR SHOWING CONFIDENTIALITY

The FAA contends that under the FOIA Improvement Act, "an agency is permitted to withhold information if '(1)the agency reasonably foresees that disclosure would harm an interested protected by [a FOIA] exemption. . .'" Def. Mem. at 28.  The agency argues that because substantial competitive harm could result from release of the Disputed Information Categories, it can be withheld under Exemption 4. *Id.* at 28-29.

The FAA's citation of this provision of the FOIA Improvement Act is missing an important word.  That word is "only."  The provision at issue reads,  an agency "shall ... withhold information ... **only if** ... (I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption ..."  5 U.S.C. § 552(a)(8)(A)(i)(emphasis added).  A showing of foreseeable harm is not an independent basis for withholding a document.  It is an *additional* requirement that must be met in order to withhold a document under an exemption, including Exemption 4.  *See, e.g., Ctr. for Investigative Reporting*, 424 F. Supp. 3d at 780.  Accordingly, it "imposes an independent and meaningful requirement on agencies before they may withhold a record under one of FOIA's exemptions." *NRDC v. EPA*, No. 17-CV-5928 (JMF), 2019 WL 4142725, at *3 (S.D.N.Y. Aug. 30, 2019); *see Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019) ("[E]ven if an exemption applies, an agency must release the document unless doing so would reasonably harm an exemption-protected interest.").

Plaintiff does not dispute that release of sensitive nonpublic proprietary technical information could be competitively harmful to Boeing.  But much of what Plaintiff is seeking does not consist of such information or is actually secret law, and must be released.   And in any event, competitive harm alone is no longer a sufficient basis for withholding any information under

Exemption 4.  The information at issue must meet the *Food Marketing Institute* test with respect to confidentiality. That requires at a minimum that the agency have not put the submitted on notice that it would release the information.  Here, it did so.  The Disputed Information Categories cannot be withheld under Exemption 4 and must be released.

## **CONCLUSION**

For the reasons stated above, and in Plaintiff's Memorandum in Support of its Motion for Summary Judgment (Doc. 21-1), Plaintiff's Motion for Summary Judgment should be granted and the FAA's Cross-Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/ Joseph E. Sandler*

November 24, 2020

Joseph E. Sandler, DC Bar #255919
Christina E. Bustos
SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.
1090 Vermont Ave., N.W. Suite 750
Washington, D.C. 20005
Tel: (202) 479-1111
Fax: (202) 479-1115
sandler@sandlerreiff.com

Of Counsel:

Andrew Appelbaum
Legal Counsel
Flyers Rights Education Fund
1530 P St NW
Washington, DC 20005

*Attorneys for Plaintiff*

23

**CERTIFICATE OF SERVICE**

I hereby certify that on this 24th day of November  2020, I caused the foregoing

COMBINED MEMORANDUM OF POINTS AND AUTHORITIES OF PLAINTIFF IN

REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR

SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANT'S  CROSS-

MOTION FOR SUMMARY JUDGMENT, to be filed via the Court's ECF system, which

caused a copy to be electronically served on all counsel of record.


*/s/ Joseph E. Sandler*


Joseph E. Sandler
Counsel for Plaintiffs