## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FLYERS RIGHTS EDUCATION FUND, INC., *et al.*,<br><br>       Plaintiffs,<br><br>   v.<br><br>FEDERAL AVIATION ADMINISTRATION,<br>       Defendant. | Civil Action No. 19-3749 (CKK) |

## MEMORANDUM OPINION
(September 16, 2021)

This lawsuit arises from a Freedom of Information Act ("FOIA") request made by Plaintiffs Paul Hudson and Flyers Rights Education Fund, Inc. ("FlyersRights") to Defendant Federal Aviation Administration ("FAA"). FlyersRights requested records pertaining to the FAA's review of design changes to the The Boeing Company's 737 MAX ("737 MAX") in the wake of two fatal crashes involving that aircraft.

Presently before the Court are FlyersRights' [21] Motion for Summary Judgment and the FAA's [23] Cross-Motion for Summary Judgment. Upon consider of the pleadings,[1] the relevant legal authorities, and the record as a whole, for the reasons stated below, the Court finds that the FAA has satisfied its burden to demonstrate that it properly withheld records pursuant to FOIA

---

[1] The Court's consideration has focused on the following: Plaintiffs' Memorandum of Points & Authorities in Support of Motion for Summary Judgment ("Pls.' Mot. for S.J."), ECF No. 21-1; Plaintiffs' Statement of Material Facts as to Which There is No Genuine Dispute ("Pls.' Stmt."), ECF No, 21-2; Combined Memorandum of Points & Authorities in Support of Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Def.'s Cross-Mot. & Opp'n"), ECF No. 23-4; Defendant's Statement of Material Facts as to Which There is No Genuine Dispute ("Def.'s Stmt."), ECF No. 23-2; Defendant's Response to Plaintiffs' Statement of Material Facts as to Which There is No Genuine Dispute ("Def.'s Resp. Stmt."), ECF No. 23-3; Combined Memorandum of Points & Authorities of Plaintiffs in Reply to Defendant's Opposition to Plaintiffs' Motion for Summary Judgment and in Opposition to Defendant's Cross-Motion for Summary Judgment ("Pls.' Reply & Opp'n"), ECF No. 26; and Reply in Support of Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply"), ECF No. 28.

Exemption 4, and so shall **GRANT** the FAA's Cross-Motion for Summary Judgement and **DENY** FlyersRights' Motion for Summary Judgment.

## I.     BACKGROUND

### A.  Factual Background

The 737 MAX is a twin-engine jet airplane manufactured by The Boeing Company ("Boeing").  Def.'s Stmt. ¶ 1.  On October 29, 2018, a 737 MAX operated by Lion Air on Flight JT610 crashed after taking off from Jakarta, Indonesia, killing 189 passengers and crew members. Pls.' Stmt. ¶ 1; Def.'s Resp. Stmt. ¶ 1.  On March 10, 2019, a 737 MAX operated by Ethiopian Airlines on Flight ET302 similarly crashed after takeoff from Addis Ababa, Ethiopia, killing 157 passengers and crewmembers. Pls.' Stmt. ¶ 1; Def.'s Resp. Stmt. ¶ 1.

Shortly after the second crash, on March 13, 2019, the FAA issued an emergency order prohibiting operation of 737 MAX series airplanes within the territory of the United States and by United States "certificated operators."  Pls.' Stmt. ¶ 2; Def.'s Resp. Stmt. ¶ 2; *see Operators of Boeing Company Model 737-8 and Boeing Company Model 737-9 Airplanes: Emergency Order of Prohibition*, 84 Fed. Reg. 9,705 (Mar. 18, 2019).  The FAA's emergency order noted that "some similarities" between these two accidents "warrant[ed] further investigation of the possibility of a shared cause for the two incidents that needs to be better understood and addressed." *Id*. at 9,706.

The FAA, which is responsible for the safety and certification of all civil aircraft manufactured and operated in the United States, "instructed Boeing to make certain design changes to the 737 MAX."  Def.'s Stmt. ¶¶ 1, 2; Declaration of Susan Cabler ("Cabler Decl.") ¶ 7, ECF No. 23-5; *see also* Pls.' Stmt. ¶ 10.  When "a manufacturer makes a major design change to an aircraft model with an existing type certificate," it must obtain from the FAA an "amended type certificate."  Cabler Decl. ¶¶ 14, 15.  In general terms, the certification process for an airplane

design change requires applicants to "show that the changed design complies with the applicable regulations and standards, to provide the means by which such compliance has been shown, and to submit a statement certifying compliance with applicable requirements." *Id.* ¶ 17 (citing 14 C.F.R. § 21.20). According to the FAA, proposed design changes by aircraft manufacturers "often consist of information the applicant considers trade secrets or proprietary commercial information." *Id.*; *see* Def.'s Stmt. ¶ 3.

### B. Procedural Background

FlyersRights submitted a FOIA request dated October 31, 2019 to the FAA, seeking records concerning the FAA's review of Boeing's design changes to the 737 MAX following the Lion Air and Ethiopian Air crashes. Pls.' Stmt. ¶ 15; Def.'s Stmt. ¶ 5. Specifically, FlyersRights requested the following records on an expedited basis:

- Records of all software changes, including [Maneuvering Characteristics Augmentation System ("MCAS")], that Boeing has submitted to the FAA for the 737 MAX since October 28, 2019.

- All software changes for the Boeing 737 MAX, including MCAS, that were proposed, required, or requested by the FAA since October 28, 2019.

- Records describing and analyzing the flaws or needed adjustments to MCAS and other 737 MAX software.

- Records describing the solutions or fixes to the aforementioned flaws that were either (1) proposed by the FAA, Boeing, [Joint Authorities Technical Review ("JATR")], [Technical Advisory Board ("TAB")], or any other federal government entity, (2) requested or required by FAA, JATR, TAB, or other federal government entity, (3) submitted to FAA, JATR, or TAB by Boeing.

- Any cost-benefit analysis of grounding and ungrounding the 737 MAX either (1) conducted by the FAA or (2) submitted to the FAA by Boeing, [Aerospace Industries Association ("AIA")], or any other party.

- Records confirming whether a cost-benefit analysis has or has not been (1) conducted by the FAA, or (2) submitted to the FAA by Boeing or any other interested party.

Cabler Decl. Ex 1, at Cabler 000100.  On December 16, 2019, FlyersRights initiated this action to compel the FAA to produce the requested records on an expedited basis.  Pls.' Stmt. ¶ 16; Def.'s Resp. Stmt. ¶ 16.  Soon thereafter, on December 23, 20219, FlyersRights filed a motion for a preliminary injunction, seeking to compel its request for expedited processing.  *See* Pls.' Mot. for Prelim. Inj., ECF No. 3.

The FAA performed an initial search for records responsive to FlyersRights' FOIA request and identified 49,000 pages of responsive materials.  Pls.' Stmt. ¶ 17; Def.'s Resp. Stmt. ¶ 17; *see* Joint Status Rep. (Jan. 13, 2020) at 1, ECF No. 8.  The parties subsequently conferred and FlyersRights agreed to narrow its FOIA request to focus on those records upon which the FAA would rely in considering the 737 MAX's "return to service."  Pls.' Stmt. ¶ 17; Def.'s Resp. Stmt. ¶ 17.  The FAA reported that 86 records comprising 9,443 pages were responsive to this narrowed request.  Pls.' Stmt. ¶ 17; Def.'s Resp. Stmt. ¶ 17; Joint Status Rep. (Jan. 21, 2020), ECF No. 9. The Court ordered the FAA to provide Plaintiff with a list of the 86 responsive records, indicating the "title, author, recipient, date, and number of pages for each document."  *See* Minute Order (Jan. 21, 2020).  The Court also ordered FlyersRights to submit a status report, informing the FAA and the Court of its requested "prioritization of these documents."  *Id.*  Both parties complied with these directives, s*ee* Pls.' Status Rep., ECF No. 10, and Plaintiffs subsequently withdrew the motion for a preliminary injunction, *see* Pls.' Mot. to Withdraw P.I. Mot.,  ECF No. 14; Minute Order (Mar. 6, 2020).

The Court also required the FAA to provide to Boeing the documents it had identified as responsive to FlyersRights' FOIA request, and directed that "Boeing shall indicate to [the FAA] over which documents it has objections and over which documents it has no objections."  Order, ECF No. 11.  In a joint report dated March 20, 2021, the FAA indicated that it had provided the

documents to Boeing, and requested that Boeing identify "(1) which of the documents contain confidential trade secrets or commercial/financial information that it objects to releasing and (2) which of the documents it has no objections." Joint Progress Rep. (Mar. 20, 2021) ¶ 1, ECF No. 15. In response, Boeing identified 76 documents for which "it objects to the release of information falling under FOIA Exemption 4." *Id.* ¶ 2. In the same report, the FAA indicated that it had produced to FlyersRights four documents in full and sixteen documents with names of Boeing employees redacted pursuant to FOIA Exemption 6. *See id.* ¶ 3; Pls.' Stmt. ¶ 20; Def.'s Resp. Stmt. ¶ 20.

As of September 2020, the FAA produced to FlyersRights the remaining responsive records, "all of which were redacted almost in their entirety except for cover memos and transmittal letters." Pls.' Stmt. ¶ 21; Def.'s Resp. Stmt. ¶ 21. On October 9, 2020, the FAA filed a *Vaughn* Index listing 108 documents. *See Vaughn* Index, ECF No. 19-1. Of the 108 documents, the FAA released five documents in full with no redactions, released 22 documents with redactions to "Boeing lower-level names" under Exemption 6, released 38 documents with redactions pursuant to Exemption 4 or a combination of Exemptions 4 and 6, and withheld in full 37 documents in full pursuant to Exemption 4 or a combination of Exemptions 4 and 6. *See* Cabler Decl. ¶ 11; *Vaughn* Index.

The FAA filed contemporaneously with its *Vaughn* Index a declaration of Jeffrey Allen, a paralegal in Boeing's Law Department. *See* Declaration of Jeffrey Allen ("Allen Decl."), ECF No. 19-2. Mr. Allen indicates that based on Boeing's review of the records identified by the FAA as responsive to FlyersRights' FOIA request, "Boeing has concluded that the majority of documents requested by Plaintiffs contain trade secrets and other proprietary commercial information that Boeing customarily and actually treats as private and that Boeing provided to the

FAA under an assurance of privacy." *Id.* ¶ 7.  Specifically, Mr. Allen attests that these documents "contain highly detailed technical information about Boeing products," as well as information about the "methods by which Boeing designs and tests its products in order to obtain certification, along with the logic and techniques Boeing uses to demonstrate compliance," which "also constitute proprietary commercial information." *Id.* ¶¶ 8, 10.  He further avers that the information contained in the responsive records "was provided to the government under an assurance of privacy," which is evident from the "context in which Boeing provided the information and the FAA's historical treatment of such information as confidential." *Id.* ¶ 16.

FlyersRights filed its pending Motion for Summary Judgment on October 28, 2020, challenging the FAA's withholdings under Exemption 4 as improper.[2]  FlyersRights categorizes the documents withheld by the FAA pursuant to Exemption 4 into seven general categories:

| Category | Documents[3] |
|---|---|
| 1.  Certification plans | 3, 4, 5, 6, 11, 13, 57, 70, 100 |
| 2.  Testing methods, plans & conditions | 1, 5, 6, 46, 48, 60, 75, 98 |
| 3.  Means of compliance | 3, 4, 5, 6, 11, 12, 14, 17, 19, 21, 23, 24, 37, 42, 49, 60, 64, 68, 71, 73, 75, 81, 91, 96. 97, 104, 107 |
| 4.  Flight test plans & criteria | 2, 50, 51, 55, 76, 77 |
| 5.  Flight test results | 2, 76, 77 |
| 6.  Safety analyses | 3 , 9, 18, 23, 26, 28, 37, 43, 44, 63, 65 |
| 7.  FAA and foreign government agency comments | 32, 41, 45, 50, 83 |

*See* Pls.' Mot. for S.J. at 9; Pls.' Stmt. ¶ 24.[4]  The FAA filed its Cross-Motion for Summary Judgment on November 18, 2020.  In support of its Cross-Motion, the FAA filed a Declaration of

---

[2] The FAA also invoked FOIA Exemption 6 to withheld in whole or in part certain records.  *See, e.g. Vaughn* Index Document Nos. 1, 2, 7.  FlyersRights does not challenge the FAA's Exemption 6 withholdings, and so the Court does not address those claims in this Memorandum Opinion.

[3] The document numbers correspond to those listed in the FAA's *Vaughn* Index.  *See* Pls.' Mot. for S.J. at 9.

[4] Although the FAA "disputes Plaintiffs' characterization of the withheld information it describes," Def.'s Resp. Stmt. ¶ 24, the Court shall refer to these general categories in its discussion, *infra* Section III.

Susan Cabler, the Deputy Director in the FAA's Certification Service, Cabler Decl. ¶ 1, a Declaration of David Polland, Director of Product and Services Safety at Boeing, *see* Declaration of David Polland ("Polland Decl.") ¶ 1, ECF No. 23-6 and a Declaration of Earl Lawrence, the Executive Director of the FAA's Certification Service, *see* Declaration of Earl Lawrence ("Lawrence Decl.") ¶ 1, ECF No. 23-7.  The FAA contends that it is entitled to summary judgment because each of the above-listed records contains "confidential commercial information" obtained from Boeing, for which it properly invoked the protection of FOIA Exemption 4.  *See* Def.'s Cross-Mot. & Opp'n at 6; Cabler Decl. ¶ 19 (the above-listed records comprise "highly technical documents that heavily incorporate proprietary information about Boeing's certification-related processes and technical data, and provide detailed descriptions of how the specific 737 MAX design changes comply with applicable regulations and standards").  The parties' cross-motions are fully briefed and ripe for the Court's consideration.

## II.    LEGAL STANDARD

Congress enacted the Freedom of Information Act, 5 U.S.C. § 552, to "pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny."  *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (citation omitted).  Congress remained sensitive to the need to achieve balance between these objectives and the potential that "legitimate governmental and private interests could be harmed by release of certain types of information."  *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc) (citation omitted), *cert. denied*, 507 U.S. 984 (1993).  To that end, FOIA "requires federal agencies to make Government records available to the public, subject to nine exemptions for categories of material."  *Milner v. Dep't of Navy*, 131 S. Ct. 1259, 1261–62 (2011).  Ultimately, "disclosure, not secrecy, is the dominant objective of the act."  *Rose*, 425 U.S. at 361.  For this reason, the

"exemptions are explicitly made exclusive, and must be narrowly construed." *Milner*, 131 S. Ct. at 1262 (citations omitted).

When presented with a motion for summary judgment in this context, the district court must conduct a "de novo" review of the record, which requires the court to "ascertain whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure under the FOIA." *Multi Ag. Media LLC v. Dep't of Agriculture*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted). The burden is on the agency to justify its response to the plaintiff's request. 5 U.S.C. § 552(a)(4)(B). "An agency may sustain its burden by means of affidavits, but only if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith." *Multi Ag Media*, 515 F.3d at 1227 (citation omitted). "If an agency's affidavit describes the justifications for withholding the information with specific detail, demonstrates that the information withheld logically falls within the claimed exemption, and is not contradicted by contrary evidence in the record or by evidence of the agency's bad faith, then summary judgment is warranted on the basis of the affidavit alone." *Am. Civil Liberties Union v. Dep't of Defense*, 628 F.3d 612, 619 (D.C. Cir. 2011) (citations omitted). "Uncontradicted, plausible affidavits showing reasonable specificity and a logical relation to the exemption are likely to prevail." *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 509 (D.C. Cir. 2011) (citation omitted). Summary judgment is proper when the pleadings, the discovery materials on file, and any affidavits or declarations "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). With these principles in mind, the Court turns to the merits of the parties' cross-motions for summary judgment.

### III.   DISCUSSION

FOIA Exemption 4 shields from disclosure "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). FlyersRights argues that the FAA has not satisfied its burden  to demonstrate that all of the withheld records are "confidential."   FlyersRights also contends that the FAA has failed to demonstrate that documents in the category of "FAA comments" were "obtained from a person." The Court shall address each issue in turn, beginning with the latter challenge, which implicates only a handful of records.

### A. The FAA Has Demonstrated that the Withheld Records Were "Obtained from a Person."

FlyersRights argues that four documents listed on the *Vaughn* Index (Documents 41, 45, 50, and 83) contain "comments by the FAA," which do not meet Exemption's 4 requirement that the information was "obtained from a person." Pls.' Mot. for S.J. at 27.  FlyersRights also contends that Document 32, which contains comments by the European Union for Aviation Safety Agency ("EASA") should be disclosed because "although EASA could be a 'person,'" it did not have "any objection" on the record to "disclosure of its comments." *Id.* at 28.  The FAA argues that all of these disputed records contain information obtained directly from Boeing, satisfying Exemption 4's requirement that it was obtained from "a person." *See* Def.'s Cross Mot. & Opp'n at  17–19. The Court concludes that FAA has demonstrated that the information at issue in these five records was "obtained from a person," (Boeing) as required by FOIA Exemption 4.  5 U.S.C. § 552(b)(4).

"Person" is defined in FOIA to include corporations, partnerships, associations, and other private organizations.  *See* 5 U.S.C. § 551(2).  FlyersRights correctly notes that information "generated within the Government" is not "obtained from a person" and therefore cannot qualify for Exemption 4.  Pls.' Mot. for S.J. at 27 (citing *Ctr. for Auto Safety v. Dep't of Treasury*, 133 F.

Supp. 3d 109, 120 (D.D.C. 2015) (additional citations omitted)); *see also S. All. for Clean Energy v. Dep't of Energy*, 853 F. Supp. 2d 60, 68 (D.D.C. 2012) (explaining that information that "constitutes that agency's own analysis" is "the agency's information, and not 'obtained from a person' under Exemption 4").  However, "information originally obtained from an outside source but later included in agency documents, may be considered 'obtained from a person.'"  *COMPTEL v. FCC*, 910 F. Supp. 2d 100, 117 (D.D.C. 2012).  "[I]nformation in an agency-generated [document] is still 'obtained from a person' if such information was supplied to the agency by a person or could allow others to 'extrapolate' such information."  *Ctr. for Auto Safety*, 133 F. Supp. at 123 (internal citations and quotation marks omitted); *see also Judicial Watch, Inc. v. Export-Import Bank*, 108 F. Supp. 2d 19, 28 (D.D.C. 2000) ("[D]ocuments prepared by the federal government may be covered by Exemption 4 if they contain summaries or reformulations of information supplied by a source outside of the government.").

FlyersRights argues that the *Vaughn* Index entries for Documents 41, 45, 50, and 83 describe "FAA comments," which are "generated by the government," and therefore not provided by a "person."  Pls.' Mot. for S.J. at 27–28.  The FAA responds that these comments addressed information that was provided "directly from a Boeing employee acting on behalf of Boeing."  Def.'s Cross-Mot. & Opp'n at 17.  In support of its argument, the FAA cites Ms. Cabler's declaration, in which she attests that the "seventy-nine pages withheld in their entirety [Documents 45 and 50] consisted of charts created through collaboration by Boeing and FAA," containing "FAA comments to Boeing's project deliverables," which "would reveal technical data and Boeing's proprietary methods of compliance if released."  Cabler Dec. ¶ 51.  Ms. Cabler further states that, with respect to the eight pages produced with redactions (Documents 41 and 83), the FAA redacted only the information that originated with Boeing.  *Id.*  The Court finds that the FAA

has provided sufficient information to conclude that these "FAA comments" involve information "obtained from" Boeing, the disclosure of which "could allow others to extrapolate" Boeing's information.  *Ctr. for Auto Safety*, 133 F. Supp. at 123.  Accordingly, the FAA has satisfied its obligation to demonstrate that the information at issue in Documents 41, 45, 50, and 83 meets the "obtained from a person" requirement of Exemption 4.

With respect to Document 32, which includes "EASA comments," FlyersRights argues only that "there is no evidence" that "EASA had any objection to the disclosure of its comments" Pls.' Mot. for S.J. at 28.  The FAA responds that the withheld page "was not authored by EASA, but is rather Boeing's description of EASA comments to Boeing's certification documentation, and steps that Boeing took to address these comments."  Def.'s Cross-Mot. & Opp'n at 18–19 (citing Cabler ¶ 52).  The FAA's description, in its *Vaughn* Index and supporting  affidavit of Ms. Cabler, establishes that this information was generated by Boeing, not the government and therefore satisfies the "obtained from a person" requirement of Exemption 4.

The Court turns next to FlyersRights' primary argument in support of its motion for summary judgment—that the FAA has failed to demonstrate that the withheld records are "confidential."

## B.  The FAA Has Demonstrated that the Withheld Records Are "Confidential."

FlyersRights argues that it is entitled to summary judgment because the FAA has failed to demonstrate that the withheld records are "confidential."  The Supreme Court recently considered the meaning of "confidential" in FOIA Exemption 4, concluding "commercial or financial" information is "confidential" "at least where" it is "[1] both customarily and actually treated as private by its owner [2] and provided to the government under an assurance of privacy."  *Food Marketing Inst. v. Argus Leader Media*, 139 S. Ct. 2356, 2366 (2019).  The Court shall address the parties' arguments with respect to each prong of the Supreme Court's test.

1.   Customarily and Actually Treated as Private by Its Owner.

FlyersRights does not appear to dispute that FAA has satisfied the first prong of the *Food Marketing* test—that the withheld information was "both customarily and actually treated as private" by Boeing.  *Id*.  FlyersRights does, however, contend that two categories of withheld information—"means of compliance" and "safety analyses"—involve public information, and so cannot be "confidential" within the meaning of Exemption 4.  *See* Pls.' Mot. for S.J. at 18, 21.  Accordingly, the Court briefly addresses the arguments as to these two categories, as they appear to fall within the first prong of the *Food Marketing* test.

Whether information is "customarily and actually treated as private by its owner" turns on "how *the particular party* customarily treats the information, *not* how the industry as a whole treats the information." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin*., 244 F.3d 144, 148 (D.C. Cir. 2001) (emphases added) (citing *Critical Mass Energy*, 975 F.2d at 872, 878–80).

FlyersRights contends that the information contained in the "means of compliance" category is publicly available, and therefore "cannot be proprietary."  Pls.' Mot. for S.J. at 18. FlyersRights indicates that "means of compliance" are "standard specifications and testing used by an aircraft manufacturer to demonstrate compliance with FAA regulations," most of which "are publicly available." *Id.*  The FAA acknowledges that some "means of compliance" methods are publicly available and that applicants for certification can "choose to use these publicly available methods to show compliance."  Cabler Decl. ¶ 29.  But applicants can also "develop their own means of compliance that are specific to their airplane design, which is *not* publicly available" because "an applicant's design will dictate how compliance will be shown[.]"  *Id.* ¶¶ 26, 29 (emphasis added).  In such cases, manufacturers maintain "means of compliance" as "confidential business information or trade secret information" because it is specific to a particular design.  *Id.*

Ms. Cabler indicates in her declaration that Boeing did not use publicly available means of compliance methods, but instead used methods developed by Boeing, and specific to the 737 MAX aircraft. *Id.*; *see also id.* ("I am not aware of any instance where Boeing has made this information publicly available."). Such "means of compliance" information, therefore, is "completely proprietary" because it is "entirely intertwined with Boeing's substantiating technical data, drawings, and safety analyses": it "describes each piece of the proposed design change that is new or different from previously certificated models, and explains how Boeing will show that each piece complies with applicable FAA regulations and standards." Cabler Decl. ¶ 27.

In reply, FlyersRights argues that because Boeing's "means of compliance" set forth the procedures that the FAA will follow to ensure that a manufacturer's design complies with FAA regulations, they constitute "legally binding agency policy," which is not confidential and must be disclosed to prevent the FAA from developing a "body of secret law." Pls.' Reply & Opp'n at 17–18 (internal citations and quotation marks omitted). But, as the FAA points out, "[o]nly applicable *regulations* are binding on the manufacturer." Def.'s Reply at 8–9 (emphasis added). The FAA explains that it "does not follow [the manufacturer's] means of compliance," but instead determines whether a manufacturer has demonstrated that its design complies with the appliable regulations; the manufacturer develops "means of compliance" as a way of "demonstrating their compliance to the FAA." *Id.* at 9 (citing Second Declaration of Susan Cabler ("2d Cabler Decl.") ¶¶ 14–15, ECF No. 28-1). Based on this information, the Court concludes that the FAA has demonstrated that Boeing's "means of compliance" are not "binding agency policy" and that they are customarily and actually treated by Boeing as confidential.

With respect to "safety analyses," FlyersRights argues that the FAA "publicly released" information about its safety analysis of the 737 MAX, including a description of "the functionality

and failure effects of the angle of attach sensors," so it is "inconsistent" for the FAA to withhold as confidential the contested "safety analyses."  Pl.'s Mot. for S.J. at 21.  In response, the FAA indicates that the publicly released information to which FlyersRights refers includes "layman's terms" descriptions, but the withheld records "heavily incorporate and describe Boeing's technical data" and include information "intrinsic to Boeing's design of its proprietary flight control software, and reveals elements of how Boeing designed those proprietary features."  Cabler Decl. ¶ 34.  The Court finds that the FAA's explanation and supporting affidavit show that these "safety analyses" incorporate Boeing's technical and proprietary information, which the company "customarily and actually" treats as private.

As noted above, FlyersRights does not appear to dispute that the remaining categories of withheld records involve information "customarily and actually" treated as private by Boeing. Based upon its review of Boeing's and the FAA's supporting affidavits, the Court is satisfied that Boeing "customarily and actually" treats the remaining categories of disputed information as "private," satisfying the first prong of *Food Marketing*.  *See, e.g.*, Cabler Decl. ¶¶ 22–23 (explaining that "certification plans" involve "proprietary data" and detailed "technical changes" and that Boeing treats "certification plans" as confidential commercial information."); *id.* ¶ 24 (nothing that "testing methods, plans, and conditions" are tailored to an applicant's "specific proprietary design"); *id.* ¶¶ 30–31 (explaining that "flight test plans" are "specific to a particular manufacturer's airplane design" and tailored to each proprietary design, so "the flight test plan is highly sensitive commercial information); Polland Decl. ¶ 4 ("The majority of documents requested by the Plaintiffs contain trade secrets and other proprietary information that is confidential and commercially sensitive. Boeing customarily and actually treats this information as private and does not make it available to the public."); *id.* ¶¶ 5–6 (explaining that the withheld

materials "reflect and embody the technical know-how and expertise that Boeing developed over decades designing, certifying, and manufacturing aircraft" and that Boeing "limits access to such information and does not disclose it publicly, in order to prevent competitors from gaining commercial advantage by obtaining detailed technical knowledge about Boeing's products and methods of conducting certification activities"); Allen Decl. ¶ 12 ("Boeing does not make public any of the information that it objects to release to Plaintiffs and, in fact Boeing goes to great lengths to keep it private.").

    2.  Provided to the Government Under an Assurance of Privacy.

FlyersRights focuses largely on the second prong of the *Food Marketing* definition, contending that the FAA has failed to demonstrate that Boeing provided the FAA the withheld records "under an assurance of privacy." *See* Pls.' Mot. for S.J. at 11–26; Pls.' Reply & Opp'n at 6–17. As other courts in this jurisdiction have observed—and as FlyersRights concedes, *see* Pls.' Mot. for S.J. at 12—the Supreme Court in *Food Marketing* did not resolve whether the second condition is "mandatory," and therefore it is "an open question . . . whether government assurance that information will remain private is necessary for such information to qualify" as confidential under Exemption 4. *Renewable Fuels Ass'n v. E.P.A.*, Civil Action No. 18-2031 (JEB), 2021 WL 602913, at *6 (D.D.C. Feb. 16, 2021) (quoting *WP Co. v. Small Bus. Admin.*, 502 F. Supp. 3d 1, 16 (D.D.C. 2020)).

FlyersRights nonetheless contends that courts in this jurisdiction have "effectively applied both prongs of the [*Food Marketing*] test," Pls.' Mot. for S.J. at 12, because "in every case they have either assumed an assurance of privacy *was* a requirement, found that this condition has been met, or found it highly relevant[,"] Pls.' Reply & Opp'n at 6–7 (emphasis added). Although other courts addressing Exemption 4 disputes since *Food Marketing* have noted that "whether an agency

provided 'an assurance of privacy' is undoubtedly *relevant* to determining whether commercial information possessed by the agency is confidential," *WP Co.*, 502 F. Supp. 3d at 16–17 (quoting *Shapiro v. Dep't of Justice*, Civil Action No. No. 12-313 (BAH), 2020 WL 3615511, at *26 (D.D.C. July 2, 2020); *see also Stotter v. Agency for Int'l Dev.*, No. 14-2156, 2020 WL 5878033, at *5 (D.D.C. Oct. 3, 2020), "none has held that this potential second prong *must* be met." *Renewable Fuels*, 2021 WL 602913, at *7 (citing *Ctr. for Investigative Reporting v. Customs & Border Prot.*, 436 F. Supp. 3d 90, 113 (D.D.C. 2019); *CREW v. Dep't of Commerce*, Civil Action No. 18-3022 (CJN), 2020 WL 4732095, at *3 (D.D.C. Aug. 14, 2020)). "Put differently, no court has yet held that 'privately held information lose[s] its confidential character for purposes of Exemption 4 if it's communicated to the government without' privacy assurances." *Id.* (quoting *Food Marketing*, 139 S. Ct. at 2363).

The Court need not determine whether the second prong of *Food Marketing* is mandatory because it is satisfied that the withheld information was provided by Boeing to the FAA under an "assurance of privacy." The FAA first cites three examples of "express" assurances of privacy. First, the FAA points to its FAA Order 8110.4C, *Type Certification*, which provides that the FAA "must <u>not</u> release proprietary information (descriptive, design, and substantiating data received from applicants) to any party who does not have written permission from the applicant (or the certificate holder)." Cabler Decl. Ex. 2, at Cabler 000212 (emphasis in original). Second, the FAA cites its Advisory Circular 20-179, *Certification Data Retention Agreements and Government Records*, which advises certificate applicants that FAA employees "have an obligation to protect your proprietary data from unauthorized release[.] Cabler Decl. Ex. 3, at Cabler 000302–303. And third, the FAA notes that it has a longstanding agreement with Boeing, entered on May 24, 1982, requiring the FAA to obtain Boeing's written permission to "copy or

incorporate" Boeing's information into "FAA prepared airworthiness documents" and to solicit Boeing's response to any request for public disclosure of certain "Airworthiness approval records." Cabler Decl. Ex. 4, at Cabler 000402.

FlyersRights contends that none of these examples of "express assurances" are sufficient because they merely "provide that in handling Boeing proprietary information, the agency will comply with the applicable law—including FOIA." Pls.' Reply & Opp'n at 9–10. In other words, according to FlyersRights, these examples provide "no assurance of privacy for any technical or proprietary information *not subject to Exemption 4* under otherwise applicable legal standards." Pls.' Reply & Opp'n at 10 (emphasis added). As the FAA observes, this position is not persuasive because FOIA does not mandate public disclosure of "privileged or confidential" "commercial or financial information"; it explicitly *exempts* such information from public release. *See* 5 U.S.C. § 552(b)(4).

In any event, the supporting declarations of Mr. Polland and Ms. Cabler also both detail "implied" assurances of privacy based on context and the history of the FAA and Boeing's relationship. *See*, *e.g.*, *Besson v. Dep't of Commerce*, Civ. A. No. 18-2527 (APM), 2020 WL 4500894, at *5 (D.D.C. Aug. 5, 2020) (finding that information was supplied to agency based on implied assurance of confidentiality); *CREW*, 2020 WL 4732095, at *4 ("The context in which [the company] provided [the agency] information—to grow its business in foreign market— supports the notion that it did so under an implied assurance of confidentiality."). For example, Mr. Polland of Boeing states: "For decades, Boeing has submitted to the FAA information of the sort sought by Plaintiffs with an understanding and expectation that the FAA would treat it as private." Polland Decl. ¶ 23. Mr. Polland testifies that "the FAA has repeatedly made clear, in a variety of guidance documents made available to the industry and the public, that it will protect

from public disclosure confidential information submitted by manufacturers such as Boeing in connection with product certification activities to substantiate and demonstrate compliance." *Id.* ¶ 25. Ms. Cabler of the FAA further states: "[T]he FAA has a longstanding history of maintaining confidentiality of documents that applicants provide to show compliance with FAA regulations, and ultimately obtain a type certificate" and "historically has not released this information to the public without the express consent of the applicant." Cabler Decl. ¶ 62.

In an effort to contradict these sworn statements, FlyersRights devotes significant portions of its briefing and supporting affidavits to discussing public statements made by FAA and Boeing officials, indicating that review of the 737 MAX's design in the wake of the two crashes would be "transparent" to the public. *See, e.g.*, Pls.' Mot. for S.J. at 13–24; Pls.' Reply & Opp'n at 11–17. For example, FlyersRights quotes FAA Administrator Stephen Dickinson's testimony before a Congressional committee, during which he stated, "We believe that transparency, open and honest communication, and our willingness to improve our systems and processes are the keys to restoring public trust in the FAA and the safety of the 737 MAX." Pls.' Mot. for S.J. at 15; *The Boeing 737 MAX: Examining the Federal Aviation Administration's Oversight of the Aircraft's Certification: Hearing Before the H. Comm. on Transportation and Infrastructure*, 116th Cong. 12 (2019) (statement of Stephen M. Dickinson, Administrator, FAA). Administrator Dickinson also indicated, "The FAA both welcomes and invites scrutiny of our processes and procedures." Pls.' Mot. for S.J. at 15; *The Boeing 737 MAX: Examining the Federal Aviation Administration's Oversight of the Aircraft's Certification: Hearing Before the H. Comm. on Transportation and Infrastructure*, 116th Cong. 14 (2019) (statement of Stephen M. Dickinson, Administrator, FAA).

From these public statements, FlyersRights concludes that the FAA publicly committed to disclose to the public the information that it is now withholding, and, in light of these public

statements, it is "inconsistent" for the FAA and Boeing to claim now that this information was provided by Boeing under "an assurance of privacy." *See* Pl's Mot. for S.J. at 13–24;  Pls.' Reply & Opp'n at 2, 11–12.  FlyersRights also discusses in great detail how disclosure of the information contained in the Disputed Information Categories is "important" to allowing outside experts or members of the public to assess the safety of the 737 MAX's design revision (as "welcomed" by Administrator Dickinson in his public comments discussed above).  Each of the experts who submitted a declaration in support of FlyersRights' motion opines that disclosure of the information withheld by the FAA pursuant to Exemption 4 is necessary for any "independent expert, aviation journalist, or public interest advocate" to "advise the public" whether there is a sufficient basis for the FAA's decision to return the 737 MAX to service, and that absent such information it is "impossible" for each of them to "express any view" or to "inform the public" as to the safety of the 737 MAX.[5]

As an initial matter, the FAA correctly observes that FlyersRights does not "identify any statements in which these executives and officials committed to releasing any specific document or any particular piece of Boeing's proprietary information."  Def.'s Cross-Mot. & Opp'n at 22; Lawrence Decl. ¶ 10.  Simply put, a commitment to "transparency" does not equate to a commitment to public release of proprietary or confidential information. Def.'s Reply at 7; Lawrence Decl. ¶ 13.  Moreover, although the Court appreciates FlyersRights' desire to independently analyze the safety of the 737 MAX, the "importance" or "necessity" of the withheld

---

[5] *See* Pls.' Mot. for S.J. Ex. 2, Declaration of Michael Neely ("Neely Decl.") ¶¶ 25–26, ECF No. 21-4; Ex. 3, Declaration of Richard A. Spinks, P.E. ¶¶ 7, 9–10 ("Spinks Decl."), ECF No. 21-5; Ex. 4, Declaration of Javier de Luis, PhD ¶¶ 10–11 ("de Luis Decl."), ECF No. 21-6; Ex. 5, Declaration of George Reed Travis ("Travis Decl.") ¶¶ 9–10, ECF No. 21-7; Ex. 6, Declaration of Geoffrey Barrance ("Barrance Decl.") ¶¶ 10–11, ECF No. 21-8; Ex. 7, Declaration of Daniel Mark Gellert ("Gellert Decl.") ¶¶ 7–8, ECF No. 21-9.

materials to any such external scrutiny has no bearing on whether such material must be disclosed under FOIA.  *See* Def.'s Reply at 8.

The Court concludes that the FAA has carried its burden to demonstrate that the disputed records were provided to the agency under express and implied assurances of privacy, which satisfies the second prong of the Supreme Court's *Food Marketing* test.  Accordingly, the FAA has demonstrated that the material it withheld from production satisfies Exemption 4's definition of "confidential" information.

### C.  The FAA Has Demonstrated that it Released All Reasonably Segregable Information.

Although the Court concludes that the FAA properly withheld the disputed records pursuant to Exemption 4, it must also "make specific findings of segregability regarding the documents to be withheld."  *Stolt-Nielsen Transp. Grp.*, 534 F.3d at 734 (internal quotation marks omitted) (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007)); *see also Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007) (explaining that a district court has "an affirmative duty to consider the segregability issue *sua sponte*" (internal quotation marks omitted) (quoting *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F. 3d 1022, 1028 (D.C. Cir. 1999)).  "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman*, 494 F.3d at 1117.  Affidavits attesting to the agency's "line-by-line review of each document withheld in full" and the agency's determination "that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions," in conjunction with a *Vaughn* index describing the withheld record, suffice. *Id.* (internal quotation marks omitted); *see also Loving v. Dep't of Defense*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the Vaughn index

and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination").

Granting the FAA its due presumption of regularity, the Court finds that the FAA has discharged its burden concerning segregability with respect to these three categories of records. The sworn declaration of Ms. Cabler, submitted in support of the FAA's Cross-Motion for Summary Judgment, establishes that each contested document was reviewed "line by line" and that "[w]here possible, the FAA segregated and release information not covered under any FOIA exemption." Cabler Decl. ¶ 66.

## IV.   CONCLUSION

Because the Court finds that the FAA properly withheld the records at issue in this case pursuant to FOIA Exemption 4, the Court **GRANTS** the FAA's motion for summary judgment and **DENIES** FlyersRights' motion for summary judgment.  An appropriate Order accompanies this Memorandum Opinion.


                                                    _____/s/_____
                                                    COLLEEN KOLLAR-KOTELLY
                                                    United States District Judge
Date: September 16, 2021

21